# Illinois Official Reports

## Appellate Court

---

### *Vance v. Joyner*, 2019 IL App (4th) 190136

---

| | |
|---|---|
| Appellate Court Caption | RHONDA VANCE, Petitioner-Appellee, v. RODERICK JOYNER, Respondent-Appellant. |
| District & No. | Fourth District<br>No. 4-19-0136 |
| Filed | December 5, 2019 |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 09-F-65; the Hon. Paul G. Lawrence, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part.<br>Cause remanded for further proceedings. |
| Counsel on Appeal | Gina L. Wood, of Thomson & Weintraub, LLC, of Bloomington, for appellant.<br><br>Angela K. Skinner, of Allison & Mosby-Scott, of Bloomington, for appellee. |
| Panel | JUSTICE DeARMOND delivered the judgment of the court, with opinion.<br>Presiding Justice Holder White and Justice Steigmann concurred in the judgment and opinion. |

**OPINION**

¶ 1        In October 2018, the trial court ordered respondent, Roderick Joyner, to pay $766.90 per month in child support. Roderick filed a motion to reconsider, and the court reduced the obligation to $760.03. In April 2019, the trial court also ordered Roderick to pay petitioner Rhonda Vance's attorney fees resulting from the litigation of this case.

¶ 2        On appeal, Roderick argues the trial court erred in (1) calculating the parties' child support obligation by failing to include gifts Rhonda received from her parents as income and miscalculating his net income and (2) ordering respondent to pay petitioner's legal fees.

¶ 3                                          I. BACKGROUND

¶ 4        In March 2009, Rhonda filed a petition pursuant to the Illinois Parentage Act of 1984 (750 ILCS 45/1 *et seq.* (West 2008)) to determine the existence of the father-and-child relationship with respect to her minor child M.J., who was born in 2006. The parties were not married at the time the minor was born and had not married thereafter. The petition named respondent as the presumed father of M.J., sought the initiation of child support payments, and requested all such payments be made to the State Disbursement Unit.

¶ 5        In July 2009, after a deoxyribonucleic acid (DNA) test established Roderick as M.J.'s father, the trial court entered an order establishing a parent-child relationship between Roderick and M.J. Three months later, the court entered a child support order, reached by the agreement of the parties, requiring Roderick to pay child support in the amount of $55.49 per week until June 1, 2025, and child support arrearages in the amount of $11.10 per week until the delinquency was satisfied. Roderick satisfied the delinquency support obligation in June 2010, and the court dismissed the claim for child support arrearages on July 2, 2010. After the court entered this order, Roderick quit making all child support payments to the State Disbursement Unit.

¶ 6        On August 27, 2015, Rhonda filed a petition to modify child support, alleging Roderick's income and M.J.'s needs had substantially increased. Rhonda also filed a petition alleging that Roderick was in civil contempt of the September 2009 child support order because he had not paid any child support after July 2, 2010. Rhonda asked the court to enter a new deficiency judgment against Roderick and order Roderick to pay her attorney fees. Additionally, after Roderick failed to properly respond to Rhonda's discovery requests, Rhonda filed a motion to compel on December 28, 2015.

¶ 7        On October 4, 2017, Rhonda also filed a petition for interim fees and costs pursuant to section 501(b) of the Illinois Parentage Act of 2015 (750 ILCS 46/501(b) (West 2016)). Rhonda alleged she had incurred significant attorney fees because Roderick had kept information from her and delayed court proceedings. She further indicated she did not have the ability to pay the balance of her attorney fees and asked the court to order Roderick to pay $8000 for her attorney fees.

¶ 8        Hearings on Rhonda's petition to modify child support were held on June 28, 2017, March 22, 2018, and April 9, 2018. After the June 28, 2017, hearing, Roderick presented the trial court with 29 new pretrial exhibits. Rhonda objected to all of the exhibits—arguing that they should not be admitted because they were not timely and the information they contained had not been disclosed during discovery—and requested sanctions. Although the trial court

recognized in its November 2017 order that Roderick violated supreme court rules and failed to comply with discovery, the court allowed Roderick to present the exhibits. The court reserved the issue of sanctions.

¶ 9                                A. Rhonda Vance

¶ 10    Rhonda is the mother of four children. M.J. is the only child she has with Roderick. She testified that M.J. attended public school and participated in several different sports. Roderick had paid child support until sometime in 2010, which resulted in child support arrearages exceeding $17,000. However, he infrequently gave her money for some of M.J.'s special expenses, such as sports equipment. From 2010 until the time she testified, Rhonda estimated that Roderick had given her a total of $500, but no more than $40 on a single occasion.

¶ 11    Rhonda also testified to the contents of her financial affidavit. She reported earning a gross income of $24,850 in 2015. She earned $2070.83 per month. Her total monthly expenses for herself and M.J. totaled $6385.14. She also made monthly debt payments. Each month her expenses and debts exceeded her income by $4468.90. On cross-examination, she acknowledged her parents helped to make up the deficits by paying her directly or making payments to her creditors. The financial assistance she received from her parents was not listed as a loan on her financial affidavit or included as income.

¶ 12    Rhonda estimated Roderick's income at approximately $83,000. He owns a barbershop, "A Kut Above," in Bloomington, Illinois, where he only accepts cash payments. Roderick told her he only accepted cash payments because cash cannot be tracked. He also has four rental properties. She also testified to calculating his gross income based on deposits made into his accounts; however, she did not take into consideration or make any deductions based on transfers between Roderick's personal and business accounts. After assessing deductions for income taxes and social security, she believed Roderick should pay $970.93 per month in child support. In October 2017, while this matter was ongoing, Roderick also purchased a 2014 Cadillac Escalade for $38,799. On loan documents, which showed Roderick as the only loan applicant and purchaser, his annual income was shown as $105,000.

¶ 13                               B. Gary Mohamed

¶ 14    Gary Mohamed is Roderick's friend and a barber at A Kut Above. He has rented a chair from Roderick for over a decade. His rent payments have been $600 for the past two years. Mohamed testified that Rhonda came to the barbershop every one-to-two weeks from 2010 through 2015. During some of those visits and from his workstation, he saw Roderick give Rhonda money. He testified that Roderick probably gave her money at least 50 different times.

¶ 15                               C. Willie Brown

¶ 16    Willie Brown is a client of Gary Mohamed and regularly visits the barbershop every two weeks. From 2010 through 2015, he saw Rhonda at the shop approximately two to three times in a two-month period. During some of her visits, Roderick would give Rhonda something; however, he did not know what Roderick gave to Rhonda.

¶ 17    Brown also testified that he loaned Roderick $7000 in 2015. A promissory note created and executed by Roderick stated the loan amount was $6000, but Brown was certain he had loaned Roderick $7000. He made the loan because road construction on the nearby bridge on

Market Street caused the barbershop to lose business and caused Roderick to experience financial difficulties.

¶ 18                                D. Tyrus Smith

¶ 19    Tyrus Smith is Roderick's friend and a longtime customer at A Kut Above. He gets his hair cut at the barbershop every two weeks and also visits the shop two to three times a week. Once every two weeks, he saw Rhonda at the barbershop. Approximately twice a month, he observed Roderick give Rhonda money.

¶ 20    Smith also loaned Roderick $7000 in 2015. He made the loan because Roderick said the barbershop was in trouble and he needed help with child support issues.

¶ 21                              E. Doni Tornowski

¶ 22    Doni Tornowski is Roderick's friend, and her sons are customers of A Kut Above. When she took her sons to the barbershop for haircuts, which occurred at least once a month, she saw Rhonda there as well. On five or six different occasions from 2010 to 2015, she observed Roderick give Rhonda money. However, she did not know how much money Roderick gave to Rhonda or the purpose of the exchange.

¶ 23                                 F. Keith Faris

¶ 24    Keith Faris, Roderick's friend since high school, is a customer of the barbershop, which he visits two to three times per week. During 8 to 10 of these visits, he observed Roderick give Rhonda an envelope or a check. He specifically recalled at least one occasion where Rhonda waved a check around and said Roderick needed to "take care of his baby mammas."

¶ 25                                G. Shawn Maier

¶ 26    Shawn Maier became a customer of A Kut Above in 2011 when he moved back to Illinois, but he has known Roderick since high school. He goes to the shop twice a month. He testified to seeing Rhonda at the barbershop and, approximately eight times, he saw Roderick give her either cash or envelopes. When Rhonda received an envelope, he never saw the contents.

¶ 27                               H. Matthew Bassi

¶ 28    Matthew Bassi is the business manager at Barker Cadillac where Roderick purchased the 2014 Cadillac Escalade. He also oversees customer financing at the dealership.

¶ 29    In October 2017, he reviewed the financing documents for the Escalade with Roderick, which included the credit application Roderick prepared with the salesperson. The credit application was made out only in Roderick's name and showed his annual income as $105,000. Bassi said, according to Barker's policy, the annual income figure should include only the applicant's personal and business income but not the applicant's fiancée's or girlfriend's income. In regard to the initial application, Bassi believed, as represented to him by the credit application, the $105,000 figure reflected only Roderick's income, not his fiancée's, until Roderick contacted him in late February 2018, just prior to the second hearing on the petition to modify child support, asking to include his fiancée on the title and loan documents.

¶ 30    Roderick originally intended to have his fiancée's name on the loan and the vehicle's title. However, she never completed the credit application needed to do so, and Roderick did not

need her name on the application to obtain financing. His fiancée was only added to the loan and title in early March 2018. The revised documents also showed their combined income as $105,000. The figure remained the same because Roderick said that he earned $30,000 to $35,000 per year and his fiancée earned $70,000 to $75,000 per year.

¶ 31                                    I. Roderick Joyner

¶ 32     Roderick Joyner is the father of four children. Two of the children are now adults. He also owns and works at A Kut Above, a barbershop on West Market Street in Bloomington, Illinois, and has four rental properties in Bloomington, three of which are presently inhabitable. The barbershop is a cash-only business, which helps him keep his prices affordable. His customers do not have much money, and accepting other forms of payment would require him to charge customers more money. He lives on Clearwater Avenue in Bloomington with his fiancée, but on several documents he lists his residence as the former apartment adjoining the barbershop.

¶ 33     Roderick testified that he stopped making payments to the State Disbursement Unit at Rhonda's request. However, he continued to pay Rhonda support every week in cash. She would come to the barbershop to receive the payments. Whenever Rhonda asked, he would also help pay for M.J.'s other expenses. He believed he had paid her more than required by the trial court.

¶ 34     Throughout the case, Roderick submitted four different financial affidavits regarding his income and expenses, three of which were admitted as exhibits. On the first affidavit, dated February 19, 2016, Roderick indicated he earned $1334.23 per month in gross income and, due to various expenses, spent $2202.43 per month. The second affidavit, which was not dated or signed, stated that Roderick's monthly gross income was $849.67 and his total monthly expenses were $1813.43. The affidavit listed no tax deductions, loans, investments, cars, or real estate. Combined with other deductions, Roderick stated his expenses exceeded his income by $1325.76 per month. In the third and fourth affidavit, Roderick showed his gross monthly income came from "business income after expenses" and was $1988.77 per month. However, the third affidavit, dated February 27, 2018, showed his monthly expenses and debt payments totaled $7195.18, which included federal taxes, state taxes, a mortgage payment, real estate taxes, renter's insurance, property maintenance, and credit card payments. In the fourth affidavit, which is dated February 27, 2018, and signed March 8, 2018, Roderick represented his gross monthly income came from "business income after expenses" and was $1988.77 per month. It also showed that he had monthly expenses and debt payments totaling $2415.70, which included federal taxes, state taxes, renter's insurance, and credit card payments. Unlike the third affidavit, the fourth affidavit did not include the mortgage expense, real estate taxes, or property maintenance expenses. In a supplement to the fourth affidavit, Roderick also listed over $67,000 in additional debts, including medical bills, credit card bills, tax obligations, and personal loans from friends and family members. Roderick acknowledged mistakes were made on each of the financial affidavits.

¶ 35     For the most recent affidavit, Roderick calculated his business income by averaging his net business income from 2014, 2015, and 2016. The net business income for each year was calculated using information contained in the banking statements for his personal checking account and business checking account. Roderick acknowledged using the accounts interchangeably and frequently transferring money between the accounts. For 2014, he calculated $94,776.75 in business revenue, $49,813.33 in business expenses, and $44,963.42

in net business income. His business expenses included mortgage payments totaling $12,875.22 and phone expenses of $10,199.16. For 2015, he calculated business revenue at $61,851.34, business expenses at $54,490.27, and net business income at $7361.07. His business expenses included mortgage payments totaling $15,541.08 and phone expenses of $10,199.16. He also reported receiving loan proceeds totaling $42,750. Similarly, for 2016, his business revenue was $81,946.48, business expenses were $63,286.46, and net business income was $18,660.02. His business expenses included mortgage payments of $13,957, maintenance totaling $17,000, and phone expenses of $2743.20. He also reported receiving loan proceeds of $20,000 and $8353.30 from business-related insurance claims. Over the three-year period, his average business net income was $23,661.50.

¶ 36    Roderick testified that his income significantly changed from 2014 to 2015 because, for approximately a year and a half, there had been road construction on a bridge, preventing customers from reaching his barbershop. During that time, he estimated losing half of his business. The loss of customers required him to take loans from his friends and family members. He used some of the loans to make extensive changes to the barbershop, resulting in the high maintenance costs, to try to bring business back. The barbershop was only now starting to recover. Roderick stated that 75% of his clients have returned, and he has gained new clients.

¶ 37    On cross-examination, Roderick stated that his phone expenses included $8817 in advertising. However, he did not have documents to support this expense. Similarly, he acknowledged some of his business expenses included his attorney fees for this case and his personal cell phone use. Additionally, although he relied on his bank statements to calculate his income, Roderick paid several bills in cash, including a power washing bill for $2100 and a construction bill for $11,000. However, the money he used to pay the construction bill was obtained from a loan. Roderick also could not explain why the figures on his affidavit and calculations for his business income were inconsistent with his tax returns. For example, for 2015 his tax return reported an adjusted gross income of $17,992.

¶ 38    Roderick submitted his own child support calculation to the trial court. On the form, Roderick indicated his gross income was $1972 per month, and after deductions for taxes and additional child support obligations, his net income was $1386 per month. He calculated Rhonda's net income at $5655 per month, which included $2071 per month in wages, $4469 in gifts from her parents, and deductions for taxes and children. Using these figures, he determined that his child support obligation should be $225 per month and Rhonda's obligation should be $1274 per month.

¶ 39    He stated that Rhonda's calculation of his income was wrong because she had overestimated his income. Her calculations included all the deposits into his personal account, which included transfers from his business account, loan proceeds, and reimbursement from his insurance claims. She also did not include his expenditures or consider his additional child support obligations.

¶ 40    Additionally, although the credit application he submitted for the 2014 Cadillac Escalade showed Roderick's income as $105,000 per year, that figure represented his income and his fiancée's income. His fiancée's income was $85,000. A Barker Cadillac employee had put their combined income on the application. However, Roderick claimed Bassi knew the $105,000 represented Roderick's and his fiancée's combined income. His fiancée was not with him when he purchased the vehicle. However, they had always intended for her name to be on the title and loan documents, which he claimed Bassi also knew, and she was left off of the

documents by mistake. To correct the mistake, his fiancée was added to the title and loan documents in March 2018. Since they purchased the vehicle together, his fiancée has always paid half of the monthly payment.

¶ 41                                   J. Posthearing

¶ 42    On October 17, 2018, the trial court found a substantial change in circumstances had occurred and granted Rhonda's petition to modify child support. In considering the evidence, the court noted:

> "It is very difficult for the court to determine the precise amount of income that Roderick earns, but it is clear that he earns well over the $23,661 that he had suggested. Rhonda has shown that his deposits into his checking account in 2015 totaled $82,342 and that his discretionary expenditures as shown by their exhibits greatly exceed $23,661 per year. Roderick operates his barber shop on a cash basis and thus makes it very difficult for the [c]ourt to calculate his employment income. Roderick has submitted four different financial affidavits, but none of them are consistent with his tax returns and it is very difficult for the [c]ourt to reconcile his tax returns with the documentary evidence he submitted. Furthermore, few of the expenses claimed by Roderick were verified with accurate documentation."

¶ 43    Since the trial court could not determine Roderick's actual income, and considering all the evidence presented, the court ordered child support in an amount it considered reasonable. As a result, the court found Roderick earned $6000 a month in gross income and calculated his child support obligation at $766.90 per month, retroactive to September 1, 2015. In determining each party's child support obligation, the court deviated from the child support guidelines and did not include "any gifts" Rhonda received from her parents as income because they resulted from "Roderick's failure to pay child support." The court also did not give Roderick a multifamily deduction for his additional child support obligations.

¶ 44    The trial court further found Roderick in indirect civil contempt for violating the July 2, 2010, court order requiring him to pay $55.49 in weekly child support. Although several witnesses testified Roderick had given Rhonda money or envelopes, the court found no evidence confirming what the envelopes contained or how much money had been given. The court determined, as of January 1, 2018, Roderick owed $22,115.80 in arrearages and interest.

¶ 45    Roderick timely filed a motion to reconsider, arguing the trial court should recalculate his income because it relied on Rhonda's inaccurate figures, which did not include deductions for transfers to his business account, business expenses, or loans, and did not include an adjustment for the child support he paid for his other minor child. He similarly argued that the court should recalculate Rhonda's income because the court erred in failing to consider the gifts from Rhonda's parents as income.

¶ 46    On February 1, 2019, the trial court issued its order on the motion to reconsider. The court reduced Roderick's net income by $141 to reflect his additional child support obligation, and the court changed his child support obligation for M.J. to $760.03 per month. The court denied the rest of his motion.

¶ 47    On April 17, 2019, after Roderick initially appealed the trial court's decision, the trial court ruled on Rhonda's pending petition and request for attorney fees. The court ordered Roderick to pay Rhonda's attorney fees "related to the Petition for Adjudication of Indirect Civil

Contempt," attorney fees and costs "related to the Motion to Bar," and a portion of her fees and costs "related to the Petition for Modification." In total, the court ordered Roderick to pay $15,014.15 for Rhonda's attorney fees and court costs. The court further determined that, as of October 31, 2018, Roderick owed $16,255.13 in child support arrearages and $7892.91 in interest.

¶ 48    This appeal followed.

¶ 49                                    II. ANALYSIS
¶ 50                            A. Rhonda's Child Support Obligation
¶ 51    Roderick argues that the trial court erred in failing to include the gifts Rhonda received from her parents as part of her income. Specifically, he contends that the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/101 *et seq.* (West 2018)) requires a child support recipient's income to be calculated using the same method as used to calculate the child support payor's income. We agree.

¶ 52    The interpretation of a statute is a question of law that is reviewed *de novo*. *Metropolitan Life Insurance Co. v. Hamer*, 2013 IL 114234, ¶ 18, 990 N.E.2d 1144. When interpreting statutes, courts must "give effect to the intention of the legislature," which is best reflected in "the plain language of the statute." *In re Marriage of Rogers*, 213 Ill. 2d 129, 136, 820 N.E.2d 386, 390 (2004). "When the language of the statute is clear, it must be applied as written without resort to aids or tools of interpretation." *In re Marriage of Turk*, 2014 IL 116730, ¶ 15, 12 N.E.3d 40.

¶ 53    The Illinois Parentage Act of 2015 directs courts to "use the guidelines and standards set forth in Sections 505 and 505.2 of the Illinois Marriage and Dissolution of Marriage Act" to determine child support. 750 ILCS 46/801(a) (West 2018). Under section 505(a)(1.5) of the Act, courts must calculate child support by:

"(A) determin[ing] each parent's monthly net income;

(B) add[ing] the parents' monthly net incomes together to determine the combined monthly net income of the parents;

(C) select[ing] the corresponding appropriate amount from the schedule of basic child support obligations based on the parties' combined monthly net income ***; and

(D) calculat[ing] each parent's percentage share of the basic child support obligation." 750 ILCS 5/505(a)(1.5) (West 2018).

¶ 54    Accordingly, because the court calculates child support based on each parent's income and determines each parent's support obligation, "[b]oth parents have the financial responsibility to support a minor child." *In re Marriage of Maczko*, 263 Ill. App. 3d 991, 994, 636 N.E.2d 559, 562 (1992).

¶ 55    A parent's financial responsibility is largely determined by his or her income. See 750 ILCS 5/505(a)(1.5) (West 2018). " 'Income' for tax purposes is not synonymous with 'income' for determining child support." *In re Marriage of Bradley*, 2011 IL App (4th) 110392, ¶ 44, 961 N.E.2d 980. Instead, a parent's net income includes "the total of all income from all sources" (*i.e.*, gross income), excluding funds received from public assistance programs or benefits received for other children, less certain tax deductions and adjustments for spousal maintenance or multifamily support obligations. 750 ILCS 5/505(a)(3)(A) (West 2018). Although the Act itself does not define income, the supreme court stated, based on the plain

and ordinary meaning of the word, income includes " 'a gain or recurrent benefit that is usu[ally] measured in money.' " *Rogers*, 213 Ill. 2d at 136-37 (quoting Webster's Third New International Dictionary 1143 (1986)). Income is also defined as " '[t]he money or other form of payment that one receives, usu[ally] periodically, from employment, business, investments, royalties, gifts and the like.' " *Rogers*, 213 Ill. 2d at 137 (quoting Black's Law Dictionary 778 (8th ed. 2004)).

¶ 56    A trial court must apply the child support guidelines, including the standards for determining income, unless, "after considering the best interests of the child and evidence [of other] relevant factors" it finds applying the guidelines would be inappropriate. 750 ILCS 5/505(a)(2) (West 2018). " '[C]onsideration of the factors set forth in section 505 of the Act is mandatory, not directory' ***." *In re Parentage of I.I.*, 2016 IL App (1st) 160071, ¶ 56, 69 N.E.3d 402. Factors the courts may consider include the financial resources and needs of both the child and parents and the child's physical and emotional well-being. 750 ILCS 5/505(a)(2) (West 2018). Similarly, a trial court "may deviate from the child support guidelines if the application would be inequitable, unjust, or inappropriate." 750 ILCS 5/505(a)(3.4) (West 2018). A court making a deviation must make "written findings *** specifying the reasons for the deviation and the presumed amount under the child support guidelines without a deviation." 750 ILCS 5/505(a)(3.4) (West 2018).

¶ 57    Contrary to Rhonda's assertion that no legal authority requires the child support recipient's income to be calculated in the same way as the child support obligor's income, section 505 of the Act is clear legal authority requiring courts to calculate the child support recipient's income in the same manner as the child support payor's income. The Act's express language requires trial courts to determine both parents' incomes, add their incomes together, and calculate each parent's share of the child support obligation. See 750 ILCS 5/505(a)(1.5) (West 2018); see also *In re Parental Responsibilities of L.K.Y.*, 2013 COA 108, ¶ 12 (finding child support order properly included military reimbursement payments received by the obligee parent as income because, where statutory guidelines required applying the parents' combined gross incomes to a schedule, there was no basis to treat an obligee parent's income differently from an obligor parent's income). The Act does not provide different deductions or exceptions based on whether a parent receives child support or pays child support. This means wages, payments, gifts, distributions, and other forms of financial assistance considered income for child support payors must also be assessed as income for child support recipients. See also *Rogers*, 213 Ill. 2d at 138 ("If a parent has received payments that would otherwise qualify as 'income' under the statute, nothing in the law permits those payments to be excluded from consideration merely because like payments might not be forthcoming in the future."). While a trial court may deviate from the guidelines when justice so requires or depart from them when the application of the guidelines would be inappropriate, a deviation is intended to be an extraordinary measure distinct from a parent's status as a recipient or obligor. 750 ILCS 5/505(a)(2), (3.4) (West 2018); *In re Marriage of Stanley*, 279 Ill. App. 3d 1083, 1085, 666 N.E.2d 340, 341 (1996) ("Compelling reasons must exist in order to overcome [the] presumption [that the child support guidelines are appropriate] and permit the court to deviate from the guidelines."). The mere fact a child support recipient may receive less support from the child support payor because he or she has more sources of income is alone not enough to warrant a deviation. Thus, the statute's plain language provides no basis, without a proper

deviation, for treating the income of a child support recipient differently from a child support payor's income.

¶ 58    Additionally, without a supported finding that the child support guidelines are inappropriate in a particular case, courts have no basis to treat the income assessment of a child support recipient, who requires financial assistance from a third party, differently from the income assessment of a child support payor, who does not require such assistance. See 750 ILCS 5/505(a)(1.5), (2) (West 2018). While the Act enables courts to consider a particular parent's ability to pay through an assessment of the parent's income, the Act itself does not create or divide parents generally by economic class. See 750 ILCS 5/505(a)(1), (1.5) (West 2018). Instead, even when one parent has the ability to solely provide for a child, both parents owe a duty to support their child. See 750 ILCS 5/505(a)(1.5) (West 2018) (calculating income based on both parents' net incomes); *Turk*, 2014 IL 116730, ¶ 25 ("Section 505(a) was intended to protect the rights of children to be supported by their parents in an amount commensurate with the parents' income."); see also *Estrem v. Estrem*, 984 S.W.2d 883, 885-86 (Mo. Ct. App. 1999) (finding where "[b]oth parents have the duty to support their minor children commensurate with their ability to pay," "[t]he fact that one parent has the financial ability to provide for all the expenses of a child does not alleviate the other parent's responsibility to support the child"). This is not to suggest that courts cannot or should not consider each parent's financial resources or ability to pay, but to apply such considerations to the parties' child support obligation, the courts must make a proper deviation, which, as we will describe below, did not occur here. Accordingly, Rhonda's assertion that income received from third parties should not be construed as income against a child support recipient, particularly when the income is a result of the recipient's need for financial assistance, is without merit.

¶ 59    With this understanding of the process for assessing income for child support, the question is whether the payments Rhonda received from her parents are income. Rhonda argues the payments she received should be considered loans, rather than gifts, and should not qualify as part of her income. We disagree.

¶ 60    Whether a gift or payment constitutes income is a question of law, subject to *de novo* review. *In re Marriage of McGrath*, 2012 IL 112792, ¶ 10, 970 N.E.2d 12. As discussed above, income is a gain, recurrent benefit, or other form of payment a person receives from any source. 750 ILCS 5/505(a)(3) (West 2018); *Rogers*, 213 Ill. 2d at 137. For the purpose of determining child support, significant gifts, whether recurring or a one-time benefit, are considered income. *In re Marriage of Mayfield*, 2013 IL 114655, ¶ 24, 989 N.E.2d 601; *Rogers*, 213 Ill. 2d at 139. While the court may consider the nonrecurring nature of the gift as a factor supporting a deviation, if the gift proceeds are income, the trial court must otherwise include the value of the those proceeds in its determination of the parent's monthly net income. See *Rogers*, 213 Ill. 2d at 138-39.

¶ 61    Income generally does not include loan proceeds. *In re Marriage of Tegeler*, 365 Ill. App. 3d 448, 458, 848 N.E.2d 173, 181 (2006). Loan proceeds are distinct from income because they "usually do not directly increase an individual's wealth" and require repayment. *Tegeler*, 365 Ill. App. 3d at 458; see also *In re Marriage of Baumgartner*, 384 Ill. App. 3d 39, 52, 890 N.E.2d 1256, 1269 (2008). But when a purported loan requires no repayment or returned obligation, the proceeds should be considered income and included as part of a parent's monthly net income. See *Rogers*, 213 Ill. 2d at 139-40 (finding that the circuit court correctly considered the annual "loans" the father received from his parents and never repaid as income

for the purposes of child support because they were "loans in name only"). To determine whether a payment or proceeds are derived from a loan, courts must examine the evidence and determine whether the payment's features fit within the plain meaning of income (*i.e.*, " 'money or other form of payment that one receives, usu[ally] periodically, from employment, business, investments, royalties, gifts and the like' "). (Internal quotation marks omitted.) *Baumgartner*, 384 Ill. App. 3d at 49 (quoting *Rogers*, 213 Ill. 2d at 136-37).

¶ 62   For example, in *Baumgartner*, the mother argued, based on *Rogers*, the mortgage loan proceeds the father used to buy his home should be considered income for child support. *Baumgartner*, 384 Ill. App. 3d at 48. However, the court rejected her argument and distinguished mortgage loan proceeds from the loans at issue in *Rogers*. The key factor as to whether a loan constituted income was if a "repayment was required or even intended when" the proceeds were distributed. *Baumgartner*, 384 Ill. App. 3d at 52. Thus, because repayments are a key feature of mortgage loans and such proceeds did not fit within the plain meaning of income, the court held "a residential mortgage loan, made by a *bona fide* lender, does not constitute income." *Baumgartner*, 384 Ill. App. 3d at 52.

¶ 63   Similarly, in *In re Marriage of Anderson*, the court considered whether "any gifts or loans [the father] may receive from his parents" should be included as income for child support. *In re Marriage of Anderson*, 405 Ill. App. 3d 1129, 1137, 938 N.E.2d 207, 214 (2010). Noting the "loans" were substantial and never required repayment, the court considered the proceeds gifts contributing to the father's means to support his children. *Anderson*, 405 Ill. App. 3d at 1137. As such, the loans constituted income and should have been factored into the father's child support obligation. *Anderson*, 405 Ill. App. 3d at 1137.

¶ 64   Here, the payments Rhonda received from her parents were gifts. Rhonda testified she received financial assistance from her parents because each month her expenses exceeded her income by $4500. Whenever needed, her parents either gave her money directly or paid her creditors. Although Rhonda suggested the funds she received were borrowed from her parents, there is no evidence Rhonda actually considered these payments loans. On her financial affidavit, Rhonda indicated she owed her parents a debt of $3600 for her son's college expenses. She did not list any other debt owed to her parents or any financial contribution from her parents. Her failure to include the payments as a debt on the affidavit suggests the payments were not considered or intended to be loans. Even if Rhonda had considered the payments loans, there is no indication that either she or her parents ever intended any form of repayment, making them loans in name only. Thus, the payments Rhonda received were gifts, which qualify as income for the purposes of determining child support.

¶ 65   However, although the trial court considered the payments Rhonda received from her parents as gifts, the court here deviated from the child support guidelines by excluding those gifts from the calculation of her income. Roderick argues this deviation was an abuse of discretion by the trial court. We agree.

¶ 66   " 'Child support is a matter within the sound discretion of the trial court, and this court will not disturb the trial court's determination absent an abuse of discretion.' " *In re Marriage of Berberet*, 2012 IL App (4th) 110749, ¶ 37, 974 N.E.2d 417 (quoting *In re Marriage of Deem*, 328 Ill. App. 3d 453, 457, 766 N.E.2d 661, 665 (2002)). "On appeal, the relevant inquiry is not whether the appellate court would have come to a different conclusion; it is whether no reasonable person would take the view adopted by the court." (Internal quotation marks omitted.) *In re Marriage of Juiris*, 2018 IL App (1st) 170545, ¶ 19, 127 N.E.3d 13. Within the

trial court's discretion is the ability to deviate from the statutory child support guidelines. 750 ILCS 5/505(a)(3.4) (West 2018) ("The court may deviate from the child support guidelines if the application would be inequitable, unjust, or inappropriate."); see also *In re Marriage of Hill*, 2015 IL App (2d) 140345, ¶ 28, 48 N.E.3d 1100 (noting a trial court's decision to deviate from the child support guidelines "will not be disturbed absent an abuse of discretion"). However, in order to deviate from the guidelines, the trial court must give "written findings *** specifying the reasons for the deviation and the presumed amount under the child support guidelines without a deviation." 750 ILCS 5/505(a)(3.4) (West 2018).

¶ 67        Here, the trial court concluded that a deviation from the child support guidelines was warranted because the gifts from Rhonda's parents resulted from Roderick's failure to pay child support. However, in making this finding and allocating Roderick's child support obligation based upon the deviation, the court neglected to include the presumed amount in his child support obligation without the deviation. As noted above, the Act requires any deviation to be supported with the reasons for the deviation, the allocation of child support based on the deviation, and the allocation of support without the deviation. 750 ILCS 5/505(a)(3.4) (West 2018). The trial court's failure to follow statutory guidelines constitutes an abuse of discretion.

¶ 68        Additionally, the trial court's foundation for the deviation was also an abuse of discretion. While the trial court correctly noted that Roderick failed to pay child support, it was not reasonable to conclude the gifts from Rhonda's parents were solely the result of his failure to pay. Prior to the court's modification, Roderick owed Rhonda $55.49 per week in child support. Rhonda testified that her monthly gross income was $2070.83 and her expenses totaled $6385.14, leaving her with an approximate $4500 deficit each month. Her financial affidavit shows that $1365 of her monthly expenses was attributable to caring for M.J. There was no other evidence indicating Roderick's failure to pay child support impacted her monthly expenses or her debts. Even if Roderick had consistently paid his child support obligation, Rhonda would still have a monthly deficit of over $4000, and as a result, she still would have needed her parent's financial support. Thus, the court abused its discretion in deviating from the child support guidelines and excluding the gifts Rhonda received from her parents from the assessment of her income.

¶ 69                                    B. Roderick's Child Support Obligation
¶ 70        Roderick argues the trial court abused its discretion in calculating his income because it relied on inaccurate, misleading, and outdated financial information. We disagree.

¶ 71        "The findings of the trial court as to net income and the award of child support are within its sound discretion and will not be disturbed on appeal absent an abuse of discretion." (Internal quotation marks omitted.) *In re Marriage of Pratt*, 2014 IL App (1st) 130465, ¶ 22, 17 N.E.3d 678. To calculate child support, the court must "determine each parent's monthly net income." 750 ILCS 5/505(a)(1.5)(A) (West 2018). A parent's net income includes "the total of all income from all sources" (*i.e.*, gross income), excluding funds received from public assistance programs or benefits received for other children, less certain tax deductions and adjustments for spousal maintenance or multifamily support obligations. 750 ILCS 5/505(a)(3)(A) (West 2018). When a source of a parent's income comes from the operation of a business, the business's net income is considered part of the parent's income. 750 ILCS 5/505(a)(3.1) (West 2018). "[N]et business income *** means gross receipts minus ordinary and necessary expenses required to carry on the trade or business," excluding "any business expenses

determined either judicially or administratively to be inappropriate or excessive." 750 ILCS 5/505(a)(3.1)(A) (West 2018); see also *Bradley*, 2011 IL App (4th) 110392, ¶ 44 ("A trial court has broad discretion to determine whether a parent's claimed business losses are reasonable for purposes of calculating child support."). If a parent's "net income cannot be determined because of default or any other reason, the court shall order support in an amount considered reasonable in the particular case." 750 ILCS 5/505(a)(5) (West 2018). The court may need to determine a reasonable amount of support "in cases where there is no credible evidence of net income." *I.I.*, 2016 IL App (1st) 160071, ¶ 57. "Such situations commonly occur in cases in which the party's testimony concerning his or her income is considered not credible by the trial court." *I.I.*, 2016 IL App (1st) 160071, ¶ 57.

¶ 72    In the case *sub judice*, we cannot find that the trial court abused its discretion in determining Roderick's income. As the record and the court's order reflect, it was very difficult to determine Roderick's income. Three different financial affidavits regarding Roderick's income were admitted as exhibits. Four financial affidavits were discussed during his testimony. Roderick acknowledged that all the affidavits contained errors. None of them consistently reported his income or expenses, and little evidence was submitted to support the amounts noted in the affidavits. Roderick also presented a calculation of his own income—which he determined by averaging his income from 2014, 2015, and 2016—and claimed his average income was $23,661.50 a year. To reach that figure, he first calculated his net business income by using bank statements from his personal and business checking accounts to determine his revenue and expenses. Although he provided copies of his bank statements and some invoices to support his categorized expenses, there was little evidence to support how he reached his totals. The bank statements also provided little clarification because they generally did not describe the nature of the transactions they reported. Roderick's calculations were also inconsistent with his tax returns. The calculations also appear inaccurate as Roderick operates a cash-only business and paid some business invoices in cash, which means there would be no record of some of the revenue he received. Except for indicating that some of the cash he used to pay these invoices came from loans, Roderick did not account for these discrepancies. Roderick also testified that some of the listed business expenses were inaccurate because they included personal expenses, such as his attorney fees. Overall, this left the court with imprecise and incomplete information about Roderick's personal and business income.

¶ 73    Rhonda also submitted evidence and calculations regarding Roderick's income. Using his personal checking account deposits for 2015, she estimated his income at $83,000 per year. Rhonda's calculations are similarly inaccurate and incomplete. For example, since her calculations only reflect deposits and transfers into the account, she did not consider Roderick's expenses or the nature of any transfers from the account. She also treated any transfers from Roderick's business account as income and, even though all the deposits in the business account were not transferred to the personal account, she did not separately assess whether any deposits into the business account should be treated as income. Based on Roderick's loan application, which she submitted into evidence, she also suggested his income could be as much as $105,000. Although Roderick argues that the income stated on the loan application includes both his and his fiancée's income, the record does not clearly show this to be true.

¶ 74    Given the conflicting documents, lack of supporting evidence, inaccurate calculations, and testimony acknowledging inaccuracies in the exhibits, the trial court made a reasonable

- 13 -

decision in determining Roderick's income was $6000 per month. There appears to have been no conceivable way for the trial court to accurately determine Roderick's income, and once that became clear, the court "was required to 'order support in an amount considered reasonable in the particular case.' " *In re Marriage of Sanfratello*, 393 Ill. App. 3d 641, 647, 913 N.E.2d 1077, 1083 (2009) (quoting 750 ILCS 5/505(a)(5) (West 2006)). In considering what was reasonable, the court was free to make inferences from, and decide the credibility of, the testimony and evidence presented. See *In re Marriage of Sweet*, 316 Ill. App. 3d 101, 109, 735 N.E.2d 1037, 1044 (2000) ("In determining net income, the court may consider the party's credibility and forthrightness in disclosing his or her income."); see also *I.I.*, 2016 IL App (1st) 160071, ¶¶ 58-60 (finding no abuse of discretion when the record showed the trial court heard incredible testimony from the respondent and when documents, such as the father's bank statements, showed he had not disclosed all of his income); *Sanfratello*, 393 Ill. App. 3d at 647 (finding the trial court acted reasonably in "drawing the inference that [the father] earned substantially more than his declared income" because the father had not been candid about his business earnings and evidence showed he enjoyed a standard of living exceeding his reported income). Here, after considering the evidence and testimony, the court found (1) it was "clear that [Roderick] earns well over the $23,661 he had suggested," (2) "few of the expenses claimed *** were verified with accurate documentation," and (3) "the [child support] figures [he] presented [were] not reliable." These inferences are supported by the record. Thus, the trial court did not abuse its discretion in setting Roderick's income at $6000 per month.

¶ 75    However, Roderick maintains the trial court erred because it improperly relied on only one year of outdated information from 2015 to determine his income and asserts it would have been "much more reasonable" to use more current information or consider an average of income over a three-year period to determine his income. While "[u]sing an average income for the previous three years of employment is a reasonable method for determining net income where income has fluctuated widely from year to year," it is not the only reasonable method of determining a parent's income. *In re Marriage of Hubbs*, 363 Ill. App. 3d 696, 706, 843 N.E.2d 478, 488 (2006). We will not find an abuse of discretion simply because an alternative may have been available to the trial court. See *People ex rel. Madigan v. Petco Petroleum Corp.*, 363 Ill. App. 3d 613, 634, 841 N.E.2d 1065, 1082 (2006) ("A trial court abuses its discretion only when its ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would adopt the court's view."). The record also does not show the trial court relied on only one year of Roderick's financial information. Instead, the court stated it considered "all of the evidence presented," which would include his 2014, 2015, and 2016 financial information. That some of the evidence it then considered or referenced was flawed, such as Rhonda's and Roderick's calculations, does not mean the court's determination of Roderick's income is inherently wrong. The court had to do its best with the information it had available. Further, Roderick's argument also presumes the court had more current figures to rely on or credible and accurate information from which the court could calculate Roderick's income. A court can only use average income when it can determine what the parent's average income is. As indicated above, the trial court had no means to reliably determine Roderick's income, let alone an average of his income, because the information provided to the court was incomplete, inaccurate, and incredible.

¶ 76    Roderick also argues that the court abused its discretion in considering his 2017 loan application, which reported his income as $105,000, as illustrative of his income because the

- 14 -

record shows the figure included his fiancée's income. Although Roderick testified the loan applications included both their incomes, and it was undisputed that Roderick and his fiancée initially planned for them both to be on the financing documents for the Cadillac, the record does not conclusively show, as Roderick suggests, that the $105,000 included his fiancée's income. Instead, it shows his fiancée never completed her own credit application, as Barker Cadillac generally required. Bassi approved the initial credit application, assuming it reflected only Roderick's income, and Roderick only told Bassi his income was $30,000 when he modified the loan to include his fiancée. While the trial court did not conclude Roderick's income was $105,000, it found he earned "well over the $23,661 that he had suggested." Further, when the trial court stated it could "consider the fact that Roderick stated on two different loan applications that he earned $105,000 per year," this indicated Roderick's testimony about the loan applications lacked credibility. See *Best v. Best*, 223 Ill. 2d 342, 350-51, 860 N.E.2d 240, 245 (2006) ("A reviewing court will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn."). Accordingly, given the inconsistencies in the testimony and the court's assessment of Roderick's credibility, the court did not abuse its discretion in considering Roderick's loan applications as factors for the purpose of determining his income.

¶ 77                                    C. Attorney Fees

¶ 78         Roderick argues that the trial court abused its discretion in ordering him to pay Rhonda's attorney fees. We disagree.

¶ 79         Before addressing Roderick's arguments, we first turn to Rhonda's contention that Roderick's brief fails to comply with Illinois Supreme Court rules and the record itself is deficient. Specifically, she argues Roderick's argument section for this issue fails to comply with Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018), since this section of his brief "is devoid of any citations to the record" and leaves this court with no means "to assess the trial court's basis for the attorney's [*sic*] fees award." Similarly, she also maintains the record is deficient because it lacks "a transcript or a bystander's report" or "any of the [trial] court's reasoning for the award." She does not assert that Roderick has forfeited this argument. Instead, she states this court must construe the record against Roderick and to find no abuse of discretion.

¶ 80         Under Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018), the appellant's brief must include an "[a]rgument [section], which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." "The failure to provide proper citations to the record is a violation of Rule 341(h)(7), the consequence of which is the forfeiture of the argument." (Internal quotation marks omitted.) *Enbridge Pipeline (Illinois), LLC v. Hoke*, 2019 IL App (4th) 150544-B, ¶ 43, 123 N.E.3d 1271. "Mere contentions, without argument or citation to authority, do not merit consideration on appeal." *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 12, 969 N.E.2d 930. Simply, "it is not our duty to search the record for material upon which to base a reversal [citation]." *Farwell Construction Co. v. Ticktin*, 84 Ill. App. 3d 791, 802, 405 N.E.2d 1051, 1060 (1980). However, where "the record is short and the issues are simple," the appellate court may choose to "address the issues anyway." *People v. Johnson*, 192 Ill. 2d 202, 206, 735 N.E.2d 577, 580 (2000). Similarly, even when the appellant's brief does not in some respects strictly adhere to the supreme court rules, where the appellate court finds the flaws were not

"so serious as to interfere with [the appellate court's] ability to understand and adjudicate [the] case," the court may address the issue presented. *State Farm Mutual Automobile Insurance Co. v. Burke*, 2016 IL App (2d) 150462, ¶ 22, 51 N.E.3d 1082. Further, where a reply brief merely clarifies and reiterates arguments introduced in a party's opening brief, but does not raise a new argument, the court may consider the clarifications and is not required to consider the argument forfeited. See *Kus v. Sherman Hospital*, 204 Ill. App. 3d 66, 71, 561 N.E.2d 381, 383 (1990).

¶ 81    Although Roderick's brief is somewhat deficient because his argument regarding attorney fees failed to include any citations to the record, the record as to this portion of the case is short and the inadequacies have not interfered with our ability to understand the argument. In considering his argument in conjunction with the statement of facts, it is evident he is contesting the award of attorney fees granted in the trial court's order dated April 17, 2019. Additionally, Roderick's reply brief clarifies and directs us to the portions of the record pertinent to his argument. While Roderick should have included these citations in his opening brief, and we do not condone any party's reliance on a reply brief to rectify such an omission, we do not find the brief so objectionable as to preclude our review of this issue.

¶ 82    However, Rhonda is correct in stating that an incomplete " 'record will be resolved against the appellant.' " (Internal quotation marks omitted.) *In re Marriage of Ray*, 2014 IL App (4th) 130326, ¶ 17, 5 N.E.3d 348. This is because the "appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92, 459 N.E.2d 958, 959 (1984). Further, a party's factual "assertions in an appellate brief cannot serve as a substitute for a proper record." *Coombs v. Wisconsin National Life Insurance Co.*, 111 Ill. App. 3d 745, 746, 444 N.E.2d 643, 644 (1982). "Any doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Foutch*, 99 Ill. 2d at 392. Additionally, "in the absence of [a sufficiently complete] record on appeal, it will be presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis." *Foutch*, 99 Ill. 2d at 392.

¶ 83    Here, the record shows Rhonda filed a notice of hearing regarding her attorney fees in December 2018. Rhonda had specifically requested the trial court to grant her attorney fees in her petition to find Roderick in indirect civil contempt and her petition for interim fees and costs. Throughout the case, Rhonda also filed at least four affidavits regarding her attorney fees, the last of which is labeled as Exhibit 12B and includes billing entries up to that date. The hearing regarding Rhonda's attorney fees was held on February 1, 2019, and it is clear from the record this hearing dealt with the petition for interim fees, which she filed in October 2017. The court admitted Exhibit 12B and two of Roderick's exhibits. The court entered an order awarding Rhonda attorney fees in April 2019. However, as Rhonda indicates, the record does not include a transcript of the February 2019 hearing or a bystander's report. Nor does the record include any stipulation between the parties to show what transpired during the hearing. See Illinois Supreme Court Rule 323 (eff. July 1, 2017). Despite the lack of information in the record describing the February 2019 hearing, Roderick states that Rhonda provided no evidence regarding either his or her ability to pay attorney fees. Since the record does not show what happened during the hearing, we must disregard Roderick's factual assertions about the hearing and limit our review to the facts described above.

¶ 84    Roderick first argues the trial court erred because section 503(j) of the Act (750 ILCS 5/503(j) (West 2018)) required Rhonda to file a "Petition for Contribution to Fees" and Rhonda

only filed a petition for interim attorney fees. Thus, Rhonda presumably is not entitled to attorney fees. However, this argument relies on an inaccurate and overly technical reading that is not required under the plain meaning of the law.

¶ 85 "The circuit court's decision to award attorney fees will not be disturbed absent an abuse of discretion."*In re Marriage of Heroy*, 2017 IL 120205, ¶ 13, 89 N.E.3d 296; see also *In re Keon C.*, 344 Ill. App. 3d 1137, 1146, 800 N.E.2d 1257, 1265 (2003) ("An award of attorney fees will not be reversed absent an abuse of discretion."). However, as noted above, the interpretation of a statute is a question of law that is reviewed *de novo*. *Hamer*, 2013 IL 114234, ¶ 18. In interpreting a statute, we must "ascertain and effectuate the legislature's intent," and "[t]he most reliable indicator of the legislative intent is the language of the statute itself, which must be given its plain and ordinary meaning. [Citation.]" *Hayashi v. Illinois Department of Financial & Professional Regulation*, 2014 IL 116023, ¶ 16, 25 N.E.3d 570. "In determining the plain meaning, we must consider the statute in its entirety, the subject it addresses, and the apparent intent of the legislature in enacting it." *Hayashi*, 2014 IL 116023, ¶ 16.

¶ 86 Under the Illinois Parentage Act of 2015, sections 501(b) and 809(a) permit courts to award attorney fees and costs. See 750 ILCS 46/501(b) (West 2018) (stating a court may award interim attorney fees and costs when it issues a temporary order); 750 ILCS 46/809(a) (West 2018) (broadly allowing courts to order reasonable attorney fees for any proceeding associated with the Illinois Parentage Act of 2015). Section 508(a) of the Act provides:

> "Interim attorney's [*sic*] fees and costs may be awarded from the opposing party, in a pre-judgment dissolution proceeding in accordance with subsection (c-1) of Section 501 and in any other proceeding under this subsection. At the conclusion of any pre-judgment dissolution proceeding under this subsection, contribution to attorney's [*sic*] fees and costs may be awarded from the opposing party in accordance with subsection (j) of Section 503 and in any other proceeding under this subsection." 750 ILCS 5/508(a) (West 2018).

¶ 87 The "propriety of an award of attorney fees is dependent upon a showing by the party seeking them of an inability to pay and a demonstration of the ability of the other spouse to do so," not the title of document the party uses. (Internal quotation marks omitted.) *In re Marriage of Minear*, 181 Ill. 2d 552, 562, 693 N.E.2d 379, 383 (1998); see also *Heroy*, 2017 IL 120205, ¶ 19 (noting "a party is unable to pay if, after consideration of all the relevant statutory factors, the court finds that requiring the party to pay the entirety of the fees would undermine his or her financial stability").

¶ 88 Accordingly, it was not an abuse of discretion for the trial court to have awarded attorney fees based on Rhonda's petition for interim fees and costs. Regardless of the title, the document sets forth the reasons for the petition, including the allegation that Rhonda lacks the ability to pay her attorney fees and a request for any additional relief the trial court deems appropriate. She properly attached an affidavit to the petition to provide a factual basis for the fees requested. As the case progressed, she continued to supplement her request for attorney fees by filing revised affidavits to reflect the growing costs of litigation. As a result, Roderick had sufficient notice that Rhonda's petition included the contribution of attorney fees incurred throughout the proceedings. Thus, the court acted reasonably in awarding Rhonda attorney fees and did not abuse its discretion in relying on her petition for interim attorney fees and costs.

¶ 89     Roderick next argues the trial court committed an abuse of discretion for failing to consider either Rhonda's ability to pay her own attorney fees or Roderick's ability to pay the fees. We disagree.

¶ 90     "The language in section 508 is clear and unambiguous. The trial court must (1) 'consider[ ] the financial resources of the parties' and (2) make its decision on a petition for contribution 'in accordance with subsection (j) of Section 503.' " *Heroy*, 2017 IL 120205, ¶ 19 (quoting 750 ILCS 5/508(a) (West 2014)). Under this framework, courts should consider a party's inability to pay attorney fees. See *Heroy*, 2017 IL 120205, ¶ 19. "[A] party is unable to pay if, after consideration of all the relevant statutory factors, the court finds that requiring the party to pay the entirety of the fees would undermine his or her financial stability." *Heroy*, 2017 IL 120205, ¶ 19.

¶ 91     Here, the record does not show what the trial court considered in awarding Rhonda attorney fees, including any evidence it may have used in making its determination. Although Roderick contends he experienced financial difficulties similar to Rhonda and requiring him to pay would place him in further financial instability, the evidence in the record does not substantiate this claim. "The [trial] court is presumed to know the law and apply it properly, absent an affirmative showing to the contrary in the record." *Cavitt v. Repel*, 2015 IL App (1st) 133382, ¶ 64, 32 N.E.3d 712. We must then assume the trial court considered both Rhonda's and Roderick's financial resources and properly made its decision in accordance with subsection (j) of section 503 of the Act. Thus, the trial court did not abuse its discretion in awarding Rhonda attorney fees.

¶ 92                                          III. CONCLUSION

¶ 93     For the reasons stated, we affirm the trial court's judgment in part, finding no abuse of discretion in the trial court's calculation of Roderick's income or in ordering him to pay Rhonda's attorney fees. However, for the reasons stated above, we reverse the trial court's judgment as to its assessment of Rhonda's income and remand for further proceedings.

¶ 94     Affirmed in part and reversed in part.

¶ 95     Cause remanded for further proceedings.