NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220531-U

NO. 4-22-0531

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 14, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re*: MARRIAGE OF | ) | Appeal from the |
| (JEFFREY D. HUFFMAN, | ) | Circuit Court of |
|     Petitioner-Appellant, | ) | Macoupin County |
|     and | ) | No. 18D117 |
| CATHY L. HUFFMAN, | ) | |
|     Respondent-Appellee). | ) | Honorable |
| | ) | Kenneth R. Deihl, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Cavanagh and Knecht concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The appellate court vacated the trial court's denial of child support and remanded the matter because the court failed to make the required written statutory findings to support its judgment.

¶ 2   Petitioner, Jeffrey D. Huffman, appeals the order of the trial court denying his petition for child support from respondent, Cathy L. Huffman. The court deviated from the statutory child support guidelines without making written findings that included the presumed amount of support as required by sections 505(a)(2) and 505(a)(3.4) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/505(a)(2), (3.4) (West 2020)). Accordingly, we vacate and remand for proper written findings as required by the Act.

¶ 3   I. BACKGROUND

¶ 4   Jeffrey filed for dissolution of marriage in 2019. The parties have one child, C.H. Initially, the trial court entered a temporary order awarding Jeffrey primary parenting time with

C.H. In April 2020, the court dissolved the marriage and awarded Cathy primary parenting time. The court ordered Jeffrey to pay $548.70 per month in child support. At that time, Jeffrey's income consisted of $3272.28 for a nonoccupational disability and $600 to $800 per month for mowing lawns. He had a retirement account that was credited with monthly contributions of $526.24. The record does not contain transcripts of most of the hearings in the case. However, the court's findings in relation to various orders show there have been multiple contentious proceedings between the parties, with each alleging various instances of abuse against the other.

¶ 5        In the order dissolving the marriage, the trial court found Jeffrey claimed stress from his employment prevented him from working, but he did not produce any medical evidence to substantiate that claim. The court found Cathy resided with friends because she did not have adequate funds to obtain her own housing. Before the dissolution, at Jeffrey's request, Cathy did not work outside the home. At the time of the dissolution, she was employed, making $16 per hour. The court found the parties "had a tumultuous marriage," and the evidence demonstrated "Jeffrey was verbally and physically cruel to Cathy." The court found that, in September 2018, "Cathy was forced to leave the marital residence because of physical abuse by Jeffrey which occurred in front of [C.H.]" The court also found Jeffrey had interfered with C.H.'s interactions with Cathy since that time.

¶ 6        The trial court found Cathy was entitled to maintenance. The court also awarded Cathy primary parenting time and ordered Jeffrey to pay $548.70 per month in child support. Jeffrey filed a motion to reconsider. On June 26, 2020, and again in September 2020, the court entered temporary orders awarding each party week-to-week parenting time, without modifying the child support amount. The court also appointed a guardian *ad litem*.

¶ 7	In October 2020, Jeffrey filed a "supplemental motion to reconsider judgment of dissolution of marriage and parenting plan and to reopen proofs," seeking, in part, reconsideration of the child support order. Cathy filed a position statement, alleging in part that Jeffrey made multiple unfounded reports of child abuse against her and her then-boyfriend to law enforcement and the Illinois Department of Children and Family Services and that Jeffrey interfered with her parenting time.

¶ 8	In November 2020, the guardian *ad litem* reported Jeffrey was eligible for retirement at the end of the year and did not intend to return to employment. Jeffrey denied abusing Cathy and alleged that, before they separated, she would leave with C.H., sometimes going out of state. Jeffrey also made various allegations that Cathy abused or neglected C.H. Cathy was currently unemployed because she was laid off during the COVID-19 pandemic. She reported that Jeffrey never paid maintenance or child support. Cathy denied abusing or neglecting C.H. and said Jeffrey had anger problems. She told the guardian *ad litem* that, when the parties separated, Jeffrey did not allow her to see C.H. for eight months. At the time of the interview, she had not seen C.H. for 30 days because Jeffrey changed his phone number, and she could not reach him.

¶ 9	C.H. told the guardian *ad litem* about various problems he encountered at Cathy's house, including lack of adequate entertainment and food. He stated he did not like to stay there. If he had his way, he would see Cathy one day per week. The guardian *ad litem* noted that Jeffrey was able to provide enticing entertainment for C.H. and had financial advantages over Cathy that were partially attributed to his failure to make maintenance and child support payments as ordered by the trial court. The guardian *ad litem* stated if Jeffrey made such payments, Cathy's situation would be improved, and she might be able to provide more in the way of toys or games for C.H.

or further material comforts. The guardian *ad litem* did not make a specific recommendation as to parenting time.

¶ 10    On December 17, 2020, the trial court modified the child support amount, ordering Jeffrey to pay $455.72 per month. The court denied Jeffrey's request that Cathy pay him a retroactive award, stating that, before obtaining employment, Cathy was living with friends who were also providing most of her food and necessities. After obtaining employment, she needed a reasonable amount of time to secure a place to live. Meanwhile, Jeffrey remained in the previous marital residence and had a steady income.

¶ 11    In February 2021, Jeffrey filed a motion to modify the allocation of parenting time, alleging C.H. reported abuse by Cathy's boyfriend and C.H. threatened self-harm if required to stay with Cathy. Cathy also filed a motion seeking the majority of parenting time, alleging various acts of interference with her parenting time by Jeffrey. The guardian *ad litem* noted various problems in both parents' relationship with C.H. C.H. had not spent time with Cathy since December 2020, had refused to attend visitation, and expressed a preference to be with Jeffrey. C.H. had previously hit, kicked, and pushed Cathy during parenting time and was unmoved by Cathy crying during an interview with the guardian *ad litem*. C.H. said Cathy lied during the divorce from Jeffrey but was unable to provide examples. The guardian *ad litem* ultimately recommended that Jeffrey be allocated the majority of parenting time but also recommended counseling, suggesting that the matter be reviewed at a later date to see if Cathy's parenting time could be increased. On March 30, 2021, the trial court temporarily awarded Jeffrey the majority of parenting time. On November 5, 2021, the court awarded Jeffrey the majority of parenting time, with Cathy awarded visitation every other weekend, every Wednesday evening, and during various holidays and school breaks. The court reserved the issue of child support.

¶ 12          On December 9, 2021, Jeffrey filed a petition for child support. The trial court held a hearing on March 23, 2022. Cathy appeared *pro se*. Evidence at the hearing showed Cathy obtained employment around the end of January 2022 and earned $4300 per month. She also received $670 per month from Jeffrey's pension. Cathy had not seen C.H. since December 26, 2021. She said no one prevented her from visiting C.H.

¶ 13          Jeffrey testified he received $3908 per month in retirement benefits. $185 per month was deducted for health insurance for C.H. and $8 for dental insurance. Jeffrey also earned an average of $333 per month from mowing lawns. Jeffrey identified a child support obligation worksheet showing his share of support as $466.33 and Cathy's share as $618.67. Jeffrey stated C.H. had been living with him full-time since March 2021. He asked that Cathy be ordered to pay support of $618.67 per month. He also sought support of $150 per month retroactive to March 30, 2021, but he did not provide any specific evidence of Cathy's income in 2021 or specifically show how that figure was calculated. He also asked that she be ordered to pay 50% of C.H.'s health and dental insurance premiums.

¶ 14          Jeffrey testified that, on December 26, 2021, Cathy "told me I got what I wanted" and "[s]he was done." When he later asked her if she was going to resume parenting time, she said, "she wasn't playing [his] game." Cathy did not respond to communication from him after that. Although visitation had not occurred, Jeffrey asked the trial court to order that the pick-up and drop-off location be changed to a location closer to his home.

¶ 15          Jeffrey admitted he had made only three child support payments and refused to pay child support since July 2020, when the trial court ordered an equal split in custody. Cathy testified Jeffrey owed her at least $5000 in support. She expressed frustration with the situation, referred to Jeffrey as a narcissist, and repeated various abuse allegations against Jeffrey that the court agreed

were not relevant to the child support issue. She also indicated Jeffrey did not allow her to retrieve personal items from the marital residence or pay her for things he disposed of, in violation of previous court orders. Cathy told the court Jeffrey had unlimited resources from family and friends and she did not have the same. She also stated Jeffrey kept C.H. from her. Ultimately, she stated:

> "Now, [Jeffrey] has disobeyed this Court and continued to do so. And I was initially granted custody of my son and I was ecstatic. But that never happened. He kept my son from me, months on end, and I never did get to keep my son. Never got my son to live with me. I fought in this court tooth and nail trying to get this taken care of and it went nowhere. You know, he has kept all of my belongings, gave stuff away, and it's never been gave [*sic*] to me. And I have moved on and I've tried moving on without my son. And it's the hardest thing to do. But I don't know what more to do because I've fought and fought and do the right thing and doing the right thing isn't good enough anymore. I don't know, you know, when the judicial system is finally going to put a stop to him, and I'm afraid that's going to come with my son being hurt. [Jeffrey] has got everything he's wanted. You know, he's got all my possessions. He's finally got my son. And I don't want—don't know what more he wants, you know. ***

> * * *

> *** I left permanently because I knew if I didn't leave I was going to get hurt where I would never be alive again, and I fear for that for my son. But I don't know what more to do. I've done all I can do. And it just doesn't seem like it's good enough."

¶ 16 The trial court asked Cathy if her intention was not to have any visits with C.H. Cathy replied, "my son is my world. But [Jeffrey] uses him against me at all aspects." The court repeated the question, and she said, "[a]s much as it hurts, Your Honor, no." The court took the matter under advisement.

¶ 17 The trial court entered a docket entry making findings of fact. In it, the court stated it considered "all the evidence presented, the credibility of the witnesses, including their demeanor and manner of testifying, the exhibits that were received into evidence, stipulations, arguments, applicable case law and statutory law, and the relevant portions of the [Act]." The court noted it had presided over the entire dissolution proceeding from its inception and had heard numerous orders of protection brought by both parties.

¶ 18 The trial court stated Cathy was a stay-at-home mother at Jeffrey's insistence and left once she decided living with Jeffrey was too mentally and physically risky. She was then homeless and jobless for a lengthy period and relied on friends to get by. The court found that, during the marriage and until recently, Jeffrey was employed but felt his job was too stressful and subsequently retired. Cathy was recently employed. The court did not provide a calculation of presumed support but stated each party's income and noted the amount each was seeking.

¶ 19 The trial court described the matter as "a high-conflict case," stating, "[t]he parties have a toxic relationship. In sum, the parties loathe each other." The court found C.H. "suffers greatly because of their behavior." The court found that the parties shared the blame for that. The court described Jeffrey as "overbearing, controlling, vengeful, and emotionally charged," and it described Cathy as a person who could be "vengeful but is more often passive, fragile, and can be emotionally insecure at times." The court then wrote:

"During the marriage the family resided in a house owned solely by Jeffrey that he brought into the marriage. He did not want Cathy to work during the marriage. Until recently, Jeffrey worked. Now, he is retired. Until recently, Cathy didn't work [and] after leaving home, was homeless for a period. Now, she is employed. Her earnings are higher than Jeffrey's pension. At all times Jeffery [*sic*] has demanded that their son live with him. Jeffrey is presently the primary custodial parent. Child exchanges throughout this case haven't gone well. Cathy hasn't seen her son since 12/26/21. Jeffrey has consistently presented as a narcissist and there are some indications that he is responsible for parental alienation. Now it's to [the] point that Cathy wants to stay clear of their child because of the mental and physical stress caused by Jeffrey's conduct. Jeffrey conversely testified that on several occasions he took their son to the exchange place and Cathy didn't show up. Now he wants her to pay child support. During these proceedings, Jeffrey has come across as a bully who is manipulative—one who made it so miserable for Cathy that she chose to leave him. Jeffrey has obstructed Cathy at nearly every turn. She isn't strong enough to stand up to his antics. Their personalities are a bad mix. He has had a house since before the marriage, Cathy had to rely on friends for a place to live for a period after the separation. Now he demands child support at a time when Cathy has been at her first good job since they married. She's been on this new job for less than 4 months. Conversely, Cathy reminded the court that there were times when she had their son and he refused to pay court-ordered child support. He countered that they had gone to a 50-50 parenting arrangement and shouldn't have to pay her for that period. She asked for $5,000 being the

approximate amount that she believes he owes her for unpaid child support. By her own choosing, Cathy isn't currently exercising her parental rights. She fears exercising them isn't healthy for her and her son. She says it's Jeffrey's overbearing narcissistic personality that's the reason for her choosing. He says their son is closer to him, and that the son is afraid of Cathy's partner. She says it's parental alienation.

Obviously, parents blaming each other never makes for a healthy family relationship. Perhaps she's right in a sense. Maybe she is the unselfish one. Perhaps she and the son are better off not seeing each other for now. Jeffrey's brute personality hasn't changed during these proceedings. Try as [it] might, the Court can admonish parents, but it can't change parents' personalities. Certainly, the child shouldn't be placed in the continuous panic of witnessing his parents['] fights at these exchanges. If the one fundamental goal here is to determine what's best for their son, and it's obvious the parties can't or won't have a healthy relationship that fosters what's best for their son, then, for now, let son live with his father, and the mother have no pecuniary responsibilities for supporting her son. For the next two years, it will give the mother time to get better financially grounded. If however mother changes her mind sooner, and petitions the court for parenting time, then father can also petition for child support."

¶ 20      The trial court then invoked the child support guidelines, stating:

"For good shown and after careful consideration of the child support guidelines set forth in 750 ILCS 5/505(a)(1) and the deviation of guidelines as set forth in 750 ILCS 5/505(a)(3.4) and 750 ILCS 5/505(a)(2), the Court (A) vacates the previous child support order, (B) denies Jeffrey's request for child support

including retroactive support and 50/50 reimbursements, (C) renders moot the issue of child exchange location, and (D) denies Cathy's request for $5,000 from Jeffrey. Child support and parenting issues can be reheard after two years or upon substantial change is [*sic*] circumstances."

¶ 21　　The trial court entered a written order denying both Jeffrey's request that Cathy be ordered to pay support and Cathy's request for $5000 in support she claimed she was owed. The written order did not include the factual findings from the docket entry. The court found the issue of the pick-up and drop-off location moot and held support and parenting issues could be reheard after two years or upon a substantial change in circumstances.

¶ 22　　This appeal followed.

¶ 23　　　　　　　　　　　　II. ANALYSIS

¶ 24　　On appeal, Jeffrey contends the trial court erred by refusing to award him support. He argues the court showed personal bias against him and failed to find a proper basis for deviating from the child support guidelines.

¶ 25　　We note that Cathy did not file a brief with this court in response to Jeffrey's claims. In *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976), our supreme court set forth three distinct discretionary options a reviewing court may exercise in the absence of an appellee's brief: (1) it may serve as an advocate for the appellee and decide the case when the court determines justice so requires; (2) it may decide the merits of the case if the record is simple and the issues can be easily decided without the aid of the appellee's brief; or (3) it may reverse the trial court when the appellant's brief demonstrates *prima facie* reversible error that is supported by the record. *Thomas v. Koe*, 395 Ill. App. 3d 570, 577 (2009) (citing *Talandis*

- 10 -

*Construction Corp.*, 63 Ill. 2d at 133). Here, the record is simple and we can decide the issues easily without the aid of an appellee's brief.

¶ 26    Section 505(a)(2) of the Act states that "[t]he court shall determine child support in each case by applying the child support guidelines unless the court makes a finding that application of the guidelines would be inappropriate, after considering the best interests of the child and evidence which shows relevant factors[,] including, but not limited to": (1) the child's financial resources and needs, (2) the parents' financial resources and needs, (3) the standard of living the child would have enjoyed absent a dissolution of marriage, and (4) the child's physical and emotional condition and educational needs. 750 ILCS 5/505(a)(2) (West 2020).

¶ 27    Section 505(a)(3.4) of the Act provides further guidance on the issue of deviation from statutory child support guidelines as follows:

"In any action to establish or modify child support, whether pursuant to a temporary or final administrative or court order, the child support guidelines shall be used as a rebuttable presumption for the establishment or modification of the amount of child support. The court may deviate from the child support guidelines if the application would be inequitable, unjust, or inappropriate. Any deviation from the guidelines shall be accompanied by written findings by the court specifying the reasons for the deviation and the presumed amount under the child support guidelines without a deviation. These reasons may include:

(A) extraordinary medical expenditures necessary to preserve the life or health of a party or a child of either or both of the parties;

(B) additional expenses incurred for a child subject to the child support order who has special medical, physical, or developmental needs; and

- 11 -

(C) any other factor the court determines should be applied upon a finding that the application of the child support guidelines would be inappropriate, after considering the best interest of the child." *Id.* § 505(a)(3.4).

¶ 28            "[B]ecause the court calculates child support based on each parent's income and determines each parent's support obligation, '[b]oth parents have the financial responsibility to support a minor child.' " *Vance v. Joyner*, 2019 IL App (4th) 190136, ¶ 54 (quoting *In re Marriage of Maczko*, 263 Ill. App. 3d 991, 994 (1992)). Thus, there is a rebuttable presumption that child support should be awarded according to the guidelines. See *In re Marriage of Tworek*, 2017 IL App (3d) 160188, ¶ 23. The parent seeking a deviation from the child support guidelines has the burden of producing evidence justifying the deviation. *Id.* ¶ 22. We review modification of child support payments for an abuse of discretion. *In re Marriage of Bussey*, 108 Ill. 2d 286, 296, (1985).

¶ 29            "While a trial court may deviate from the guidelines when justice so requires or depart from them when the application of the guidelines would be inappropriate, a deviation is intended to be an extraordinary measure distinct from a parent's status as a recipient or obligor." *Vance*, 2019 IL App (4th) 190136, ¶ 57. Compelling reasons must exist to overcome the presumption that the child support guidelines are appropriate and permit the court to deviate from the guidelines. *In re Marriage of Stanley*, 279 Ill. App. 3d 1083, 1085 (1996). "[T]he statute's plain language provides no basis, without a proper deviation, for treating the income of a child support recipient differently from a child support payor's income." *Vance*, 2019 IL App (4th) 190136, ¶ 57.

¶ 30            "While the Act enables courts to consider a particular parent's ability to pay through an assessment of the parent's income, the Act itself does not create or divide parents generally by economic class." *Id.* ¶ 58. "Instead, even when one parent has the ability to solely provide for a

child, both parents owe a duty to support their child." *Id.* "This is not to suggest courts cannot or should not consider each parent's financial resources or ability to pay, but to apply such considerations to the parties' child support obligation, the courts must make a proper deviation." *Id.*

¶ 31     For example, exceptional circumstances compelling enough to justify a deviation from the guidelines may arise when the noncustodial parent's resources are very limited or applying the guidelines would create a windfall for the custodial parent. *Stanley*, 279 Ill. App. 3d at 1086. The Act requires that a court making a deviation must make " 'written findings *** specifying the reasons for the deviation and the presumed amount under the child support guidelines without a deviation.' " *Vance*, 2019 IL App (4th) 190136, ¶ 56 (quoting 750 ILCS 5/505(a)(3.4) (West 2018)).

¶ 32     Here, the trial court, in its docket entry, asserted that it considered sections 505(a)(1), 505(a)(2), and 505(a)(3.4) of the Act, which pertain to the guidelines and deviations therefrom. However, the court did not further connect the specific statutory considerations to its factual findings. The court's findings suggest it may have deviated from the guidelines because Cathy was newly employed, payment of child support could be a hardship for her, and Jeffrey was financially able to provide for C.H. Thus, although the court did not expressly articulate those facts as a basis for deviating from the guidelines, there is some support in the record for a deviation. However, the court's findings also appeared to incorrectly assume that Cathy was not required to pay support when she was not exercising her visitation rights with C.H., with the court stating it would revisit the issue if she decided to resume visitation. Further, the court appeared to determine that Cathy still needed time to become "financially grounded," even though there was no evidence to that effect. Jeffrey alleges the record shows bias against him on the part of the trial court. We

disagree that the record shows a specific personal bias against Jeffrey. Instead, the court recognized evidence showing issues with both parties, and the court understandably expressed frustration. It appears the court was attempting to reach what it viewed as an equitable solution under difficult circumstances. But in doing so, the court failed to specifically connect its factual findings to its determination that no award of support was warranted under the requirements of the Act.

¶ 33    The law is clear that both parties owe a duty of support, with the burden on Cathy to produce evidence justifying any deviation. The trial court did not include in its order the presumed amount of Cathy's child support obligation without the deviation. Providing that calculation and making specific findings in relation to the presumed amount of support would have clarified the court's findings, satisfied the requirements of the Act, and made the order conducive to appellate review. The failure to provide the presumed amount of support constitutes an abuse of discretion. See *id.* ¶ 67. Accordingly, we vacate the court's order denying Jeffrey's request for child support.

¶ 34    Jeffrey asks that we remand with instructions for the trial court to order Cathy to pay $618.87 per month as child support and insurance contributions of $110.05 per month, retroactive to March 30, 2021. However, as previously noted, the record contains evidence to support a finding that a deviation may be appropriate. Further, the record contains evidence Jeffrey was in arrears on his own past support obligations. He also sought retroactive support without fully providing evidence to justify the amount he requested. Just as the court's failure to make the proper findings should not result in a windfall for Cathy, it should also not result in a windfall for Jeffrey. Accordingly, we remand with directions for the court to make written findings in compliance with the Act, expressly justifying the decision to deviate from the child support guidelines. Those findings should include a calculation of the presumed amount of support.

¶ 35                                   III. CONCLUSION

¶ 36          For the reasons stated we vacate the trial court's judgment and remand for specific

written findings consistent with the mandate of the Act.

¶ 37          Order vacated; cause remanded with directions.