2024 IL App (1st) 230660-U

FIFTH DIVISION
August 23, 2024

No. 1-23-0660

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | |
| | ) | Appeal from the |
| YASEMIN CELIK, | ) | Circuit Court of |
| | ) | Cook County. |
| Petitioner-Appellant, | ) | |
| | ) | No. 20D4834 |
| and | ) | |
| | ) | Honorable |
| ONUR CELIK, | ) | Marita Sullivan, |
| | ) | Judge Presiding. |
| Respondent-Appellee. | ) | |

JUSTICE MIKVA delivered the judgment of the court.
Presiding Justice Mitchell and Justice Navarro concurred in the judgment.

**O R D E R**

¶ 1  *Held*: The judgment of the trial court is affirmed where appellant failed to show that the trial court's finding that certain funds for the downpayment of the marital condominium should be reimbursed to appellee's nonmarital estate was against the manifest weight of the evidence or that the trial court abused its discretion in distributing the equity in that condominium, awarding maintenance and child support, denying contribution for attorney fees, and reallocating the payment of fees to the guardian *ad litem*.

¶ 2  This is an appeal from a judgment for dissolution of marriage in which the trial court granted appellee Onur Celik (Onur) a $112,000 reimbursement to his nonmarital estate, allocated

1

the remainder of the parties' assets and debts, set child support and maintenance, reallocated the fees owed to the guardian *ad litem* (GAL), and required each party to be responsible for its respective outstanding attorney fees. Appellant Yasemin Celik (Yasemin) appealed.

¶ 3    For the reasons that follow, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5    Yasemin and Onur were married on June 16, 2016. They had one child, Arya. On June 23, 2017, Onur purchased a condominium located at 1322 S. Prairie Ave, Unit 402, Chicago (the condo), in his name alone. The mortgage was also taken out in his name alone. After the purchase, the family lived in the condo and, in January 2020, Yasemin's mother moved in as well.

¶ 6    In July 2020, Yasemin filed a petition for dissolution of marriage. Onur filed an appearance and then a counter-petition for dissolution.

¶ 7    By agreed order, on December 16, 2020, the court mandated that Onur pay the mortgage, home expenses, both parties' health insurance, $1100 per month in unallocated support, and Yasemin's phone bill. On January 28, 2021, the parties agreed Onur would pay Yasemin $10,000 as a predistribution of marital assets for moving expenses and a rental deposit to help Yasemin leave the condo. The court also appointed a GAL, whose retainer Onur was required to pay in full.

¶ 8    In October 2021, the court issued another agreed order appointing a new GAL and apportioning the retainer with Yasemin paying $750 and Onur paying $1750.

¶ 9    Trial began in July 2022 and, over seven nonconsecutive days, ended in December. We review the trial testimony that is relevant to the issues raised on appeal.

¶ 10                                   A. Yasemin

¶ 11   Yasemin is a dual-Turkish-U.S. citizen. She testified through a translator. She is employed as a commerce attaché with the Turkish Consulate General.

¶ 12    The parties spend much of their briefs discussing whether Yasemin's monthly salary of $3444 was gross or net. When asked during direct examination, "[w]hat is your *gross* income per month" (emphasis added), Yasemin stated that she earned $3444. Her counsel then asked, "that is before taxes; is that correct?" She replied, "Yes." Yasemin's counsel later asked, "[w]hat taxes do you pay on [your] income." Yasemin responded, "All the taxes that [are] required according to U.S. law." She added that she also paid a Turkish social security tax. Her counsel then repeated a version of her earlier question: "Does the $3,444 per month represent the gross after [you] pay the Turkish tax?" Yasemin replied that it did.

¶ 13    A letter from Yasemin's employer stated Yasemin's "monthly *net* salary [was] $3.444" (emphasis added). The employer further provided a document indicating an agreement between the Turkish and United States governments ensured Yasemin would not have to pay double taxation. The Turkish government consequently paid "Yasemin back State and Federal Tax *** [b]ut not Social Security because Yasemin is a US Citizien [*sic*]."

¶ 14    The court asked about this topic later in the trial: "Will the Turkish government reimburse any U.S. taxes you have to pay?" Yasemin replied that it would but not social security or Medicare. She also stated that she did not file taxes because she did not have the money to pay and the reimbursement would not be sent to her for several months. She stated that, as a result, she owed $5100 to the Internal Revenue Service.

¶ 15    Yasemin testified that she had a pension for work performed in Turkey prior to immigrating to the United States. She sold a piece of property in Turkey for about $23,500 in 2021, which she spent on "[her] needs" and her "father's debt." She had access to social security benefits in Turkey, but she could not provide a cash value for them as she had not yet attained the age required to receive them.

¶ 16 Yasemin testified that she did not have information regarding Onur's Roth IRA account. She knew he had a guitar collection valued at $13,050. She further stated that, during the marriage, Onur had paid $20,000 worth of her debts owed in Turkey.

¶ 17 Yasemin testified that she believed funds for the condo's downpayment came from money saved while the couple was living together and during their marriage.

¶ 18 Yasemin stated that she had paid $11,500 in something she referred to as "execution debt." She testified to owing $1814 on a Chase credit card as well as money to friends and family, which included a $25,000 loan from her brother.

¶ 19 Yasemin stated that she was unable to pay the rent at her new apartment in either June or July of 2022. She was two months behind on paying for Arya's daycare in October 2022. Yasemin testified to paying for Arya to attend a Chicago Park District camp. During the pendency of the case, she stated that her cell phone stopped working, requiring her to buy a new phone and increasing the monthly bill from $50 per month to $150. She also said that she spent $600 a month on Arya's clothing. She testified to having an out-of-pocket maximum of $1500. In one of her financial affidavits, she indicated that she spent $490 per month on entertainment. In that affidavit, she also described her spending $12,379 in one year on dental care. When asked about this at trial, she stated that the money was used to treat "pain in [her] mouth." Yasemin testified that, between four bank accounts, she had a net balance of negative $500.

¶ 20 During the pendency of the case, Yasemin filed several petitions seeking Onur's contribution to her attorney fees. The trial court issued two agreed orders requiring Onur to pay $7500 of Yasemin's fees. Yasemin testified to owing one former attorney $6692, another attorney $2864, and $28,000 to her trial attorney. Her brief states that the attorneys received $11,000 total, but the citation to the record does not support this figure.

¶ 21    Yasemin testified to taking a class in the United States on information technology (IT), for which she earned a certificate. Before immigrating, she worked as a "senior IT *** manager" and was also qualified as an industrial engineer. After immigrating and obtaining a work permit, however, she had challenges securing work in IT because she testified to not having sufficient fluency to compete in interviews. She stated that her English has since improved, and the certificate should help her acquire work.

¶ 22    Yasemin made several requests to the court. She asked the court to order Onur to reimburse her for several cash withdrawals he had taken out. When asked how to split Onur's retirement account, Yasemin asked for "75 percent." She testified that she needed the money "to provide for [her and Arya's] lifestyle," "to pay [her] debts," and because "[Onur] [made] four times [her] income, [she] need[ed] the money, and he [didn't] need it that much." She also asked for $1200 monthly to support her and Arya.

¶ 23                                    B. Onur

¶ 24    Onur testified that he used a credit card, his income, and a nonmarital savings account to pay $3931.91 per month in attorney fees for his own counsel, payments to opposing counsel, the GAL's fees, and to pay a mediator, who had been involved prior to the trial. The parties agreed that Onur paid a total of $43,271.62 to his attorney.

¶ 25    Onur testified that he earned about $115,000 per year as an engineer, an insignificant amount in dividends and interest, and an irregular bonus. Onur's 2021 W-2 reflected that his income that year was $112,283.93. Paystubs indicated that Onur earned $119,928.03 in 2021 and $69,270.40 from January through June 2022. He received a bonus in both 2020 and 2022, but not in 2021.

¶ 26    Onur testified that he saved funds for the condo's purchase in a Capital One checking

account. In May 2016, one month before the marriage, a statement from that account showed a balance of $112,338.67. A separate statement demonstrated that Onur transferred $20,000 from the Capital One account to his Citibank account on May 9, 2017, just a few days before closing on the condo. Another statement demonstrated that $92,000 was transferred from the Capital One account to his individual Citibank account on June 22, 2017.

¶ 27                                   C. Expert Testimony

¶ 28     Onur presented the testimony of Kimberly Grady, a financial consulting analyst providing neutral services for divorce proceedings. The court found her to be an expert. She testified to tracing the total returns of Onur's 401(k) account using the account's return statements and then separating the marital from nonmarital portions. She calculated Onur's premarital portion as $138,521 and the marital portion as $76,206.

¶ 29                                   D. The Court's Ruling

¶ 30     On December 20, 2022, the trial court issued an oral ruling that it entered as a written judgement for dissolution of marriage on March 13, 2023.

¶ 31     The court divided Onur's retirement account according to Ms. Grady's calculation, giving Yasemin 50% of the marital portion or $38,103.

¶ 32     The court valued the condo at $450,000 and awarded it to Onur subject to a buyout of Yasemin's share. The equity in the marital residence was calculated as $63,584.23, to be allocated 60% to Yasemin and 40% to Onur. However, after credits were applied for distributions to Yasemin during the pendency of the case, Yasemin received only $31,410.53. Yasemin was not charged a credit for the $7500 that Onur had paid for her attorney fees.

¶ 33     The court found "by clear and convincing evidence" that Onur contributed a traceable $112,000 from his nonmarital estate to the marital estate for the condo's downpayment. The court

stated, "[T]he evidence here was really pristine on it ***. It's not often that a Court gets faced with such *** clear and convincing evidence." The court added that because the condo and mortgage were titled in Onur's name alone, "[t]here's no evidence that it was a gift."

¶ 34     Onur was given title to the parties' 2005 Volkswagen, which was titled in his name. He was required to pay Yasemin 50% of the equity, which was $950. Yasemin received 25 shares, or 50% of Onur's marital BP stock. Onur kept an additional 750 nonmarital shares.

¶ 35     The court denied Onur's request for reimbursement of $20,000 wired to Turkey, as well as another $11,500 of marital funds that had been used to pay off Yasemin's debts.

¶ 36     The court awarded Yasemin nine months of guideline maintenance, at $832 per month, based on a 4.1-year marriage. It ordered Onur to pay child support at $134 a month. The court arrived at that figure by requiring Onur to pay $224 monthly based on the parties' respective incomes and then deducting from that a 40% share of Arya's health insurance premium, amounting to $90, which Yasemin would pay. The court stated that it calculated Onur's income as $119,000 per year and that Yasemin earned $3444 per month net. The court further noted that it was confident that Yasemin's employment future was "very bright" in light of her Turkish college degree and the IT certificate she acquired. The court denied rehabilitative maintenance.

¶ 37     GAL fees were reallocated. Onur would pay 60% and Yasemin would pay 40% of the outstanding fees. Each party was to be responsible for its own remaining attorney fees.

¶ 38     The parties were each awarded their own bank accounts with no offset or credit. Onur's accounts were valued at $10,059.64. Yasemin's were valued at $639.30.

¶ 39                                    E. This Appeal

¶ 40     During the pendency of this appeal, Onur made a motion for leave to supplement the record, arguing exhibits that were presented before the trial court had been omitted in error. Both

Yasemin and Onur cite these exhibits in regard to the $112,000 downpayment on the condo that was reimbursed to Onur's nonmarital estate. This court denied Onur's motion because these exhibits had not been certified as part of the record in this case by the clerk of the trial court but ordered Yasemin to present and file a certified supplemental record to the court by March 13, 2024. No supplement was filed.

¶ 41                                      II. JURISDICTION

¶ 42    The judgment for dissolution of marriage was entered on March 13, 2023. Yasemin timely filed her notice of appeal on April 12, 2023. This court has jurisdiction over the appeal pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments entered by the circuit court in civil cases.

¶ 43                                      III. ANALYSIS

¶ 44    Yasemin raises four issues on appeal. These are, that the trial court erred in (1) reimbursing Onur $112,000, (2) dividing the marital estate 60-40 in favor of Yasemin where a more disproportionate division in her favor was appropriate, (3) determining the parties' income, which resulted in flawed maintenance and child support awards, and (4) determining the parties should be responsible for their own outstanding attorney fees and costs, and in its allocation of responsibility for the GAL fees. We address each issue in turn.

¶ 45                    A. Reimbursement to Onur's Nonmarital Estate

¶ 46    The Illinois Marriage and Dissolution of Marriage Act (Act) requires the court to identify the parties' marital and nonmarital property in a dissolution of marriage proceeding. 750 ILCS § 5/503 (West 2022). Section 503(c)(2)(A) mandates reimbursement to a contributing party's nonmarital estate if the contributed funds are traceable by clear and convincing evidence and were not a gift. *Id.* § 503(c)(2)(A). That section states,

8

"When one estate of property makes a contribution to another estate of property, the contributing estate shall be reimbursed from the estate receiving the contribution notwithstanding any transmutation. No such reimbursement shall be made with respect to a contribution that is not traceable by clear and convincing evidence or that was a gift." *Id.*

¶ 47   On appeal, Yasemin argues Onur's contributions to the marital condo were not traceable by clear and convincing evidence or else were a gift. Therefore, according to Yasemin, the trial court erred in ordering the reimbursement of $112,000 to Onur's nonmarital estate.

¶ 48   A trial court's factual findings—"such as whether property is marital or nonmarital, *** [and] whether reimbursement is appropriate ***—will not be reversed on appeal unless they are against the manifest weight of the evidence." *In re Marriage of Dhillon*, 2014 IL App (3d) 130653, ¶ 29. "A finding is against the manifest weight of the evidence only if it is clearly apparent from the record that the trial court should have reached the opposite conclusion or if the finding itself is arbitrary, unreasonable, or not based upon the evidence presented." *Id.*

¶ 49   The trial court went out of its way to articulate the extent to which the evidence before it supported reimbursement. It had before it detailed records of the involved accounts, transfers, and the downpayment for the purchase of the condo. Having reviewed those records, the court stated,

"[T]he evidence was really pristine ***. It's not often that a Court gets faced with such *** clear and convincing evidence. Overwhelming evidence in my mind and [based on] what was presented to me, *** it was a clear $112,000 from nonmarital money *** went in to purchase the condominium, which was marital."

¶ 50   In her brief, Yasemin argues the trial court erred because nonmarital money for the downpayment of the condo was mixed with marital funds in such a way as to render traceability neither clear nor convincing. As proof, she cites specific trial exhibits that were not included in the

record on appeal.

¶ 51    It was Yasemin's burden to present a sufficiently complete record to support her arguments. *Chicago Title & Trust Co., Trustee Under Trust No. 89-044884 v. Chicago Title & Trust Co., Trustee Under Trust No. 1092636*, 248 Ill. App. 3d 1065, 1075 (1993) (citing *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984)). Thus, "any doubts which may arise from the incompleteness of the record [are] resolved against the appellant." *Id.* Because Yasemin's argument is based on trial court exhibits that are unavailable on appeal, we have no basis on which to conclude the trial court's findings were against the manifest weight of the evidence.

¶ 52    We also note that the exhibits that are included in the record fully support the trial court's determination that the $112,000 was Onur's nonmarital money. The record contains an account statement from Onur's Capital One account dated one month before the couple was married amounting to $112,338.67. This number roughly corresponds with the amount reimbursed. In addition, the record contains account statements demonstrating that $112,000 was transferred from the nonmarital Capital One account to the individual Citibank account that was then used to pay for the condo.

¶ 53    Yasemin also argues that the downpayment was a gift. In support, she cites *In re Marriage of Didier*, 318 Ill. App. 3d 253, 265 (2000). There, the wife transferred $231,500 to her husband's company only to later claim, during the dissolution proceedings, that the money was a loan. *Id.* We held that kind of a transaction was presumptively a gift and required rebuttal evidence to prove it was not. *Id.* at 265-66.

¶ 54    According to Yasemin, *Didier* affords the same presumption here. The trial court, by finding there was "no [such] evidence" that the $112,000 was a gift thereby improperly shifted the burden of proof to Yasemin.

¶ 55    Yasemin's argument relies on a misunderstanding of *Didier*. In that case, we applied the presumption that the transactions at issue were a gift after the funds were transferred from the wife to the *husband's* business. We cited *In re Marriage of Riech*, 208 Ill. App. 3d 301, 311 (1991). In *Riech*, we held that "[t]he placement of nonmarital property in joint tenancy *or some form of coownership* raises the presumption that a gift was made to the marital estate." (Emphasis added.) *Id.* In both *Riech* and *Didier*, the presumption that the funds at issue were a gift applied because ownership had been transferred in whole or in part—either to the husband's company or a co-owned bank account.

¶ 56    That is not the situation here. Here, both the mortgage and property were held in Onur's name alone. At no point did any of the funds support a condo that was held in coownership or joint tenancy—triggering *Riech*. Nor were these funds transferred to a business owned by Yasemin—triggering *Didier*. There was no transfer of ownership and thus no reason to presume a gift had been made.

¶ 57    The trial court was mindful of the relevant facts. It stated that the condo "wasn't titled in both of their names *** which would lend some credence to the argument that it might have been a gift. *** The mortgage was only held in Mr. Celik's name as well." Without any presumption that the $112,000 was a gift, the trial court's finding that it was part of Onur's nonmarital estate was not against the manifest weight of the evidence.

¶ 58                    B. Division Of The Marital Residence

¶ 59    Yasemin next argues that the apportionment to her of 60% of what she refers to as the "marital estate" was an abuse of discretion because a "substantially greater disproportionate share" was appropriate. In her brief Yasemin refers to the "marital estate," but it appears from the trial court order that the only 60-40 distribution was for the equity in the condo—which was

11

$63,584.23. The court apportioned 60% to Yasemin and the remaining 40% to Onur.

¶ 60    The Act requires the trial court to "divide the marital property without regard to marital misconduct in just proportions considering all relevant factors." 750 ILCS 5/503(d) (West 2022). The statute then lists a number of factors to be included in this calculation. *Id.* § 503(d)(1-12). We have made clear that the division must be equitable, but not necessarily equal. *In re Marriage of Foster*, 2014 IL App (1st) 123078, ¶ 103. We review a trial court's apportionment for an abuse of discretion. *In re Marriage of Abu-Hashim*, 2014 IL App (1st) 122997, ¶ 22. An abuse of discretion occurs when no reasonable person would take the view adopted by the trial court. *Id.*

¶ 61    In support of her argument, Yasemin points to the trial court's award to Onur of 750 nonmarital shares of BP stock, as well as 25 marital shares, his own bank accounts (which were valued at $9420.34 more than Yasemin's), 50% of the marital portion of his 401(k) account, 50% of an automobile, and the denial of contribution for attorney fees. In total, according to Yasemin's brief, Onur received $160,571 in nonmarital assets as well as his $112,000 reimbursement. Yasemin, in contrast, received $78,577.84 in marital assets and her Turkish pension.

¶ 62    The trial court's ruling was thorough and detailed. It factored in the future earning potential of each spouse and took seriously its responsibility to divide marital assets in just proportions according to the twelve factors listed in section 503(d). While the court is to consider "the relevant economic circumstances of each spouse when the division becomes effective" (750 ILCS 5/503(d)(5) (West 2022)), this does not mean that the parties must be in identical economic circumstances after the distribution. See *In re Marriage of Callahan*, 2013 IL App (1st) 113751, ¶ 21 (while the distribution must be equitable, "this does not mean mathematical equality"). There was no abuse of discretion in this distribution and no basis for overturning it on appeal. See *Bird v. Luhr Brothers, Inc.*, 334 Ill. App. 3d 1088, 1091 (2002) ("The role of the

appellate court is not to substitute its judgment for that of the trial court[.]").

¶ 63    C. Trial Court's Determination of Maintenance, Child Support, and the Parties' Incomes

¶ 64    Yasemin argues that the trial court erred in its award of maintenance and child support because it used incorrect information to calculate the parties' respective incomes. A trial court's award of maintenance and child support and the expected income that it relies on are reviewed under an abuse of discretion standard. *In re Marriage of Sawicki*, 346 Ill. App. 3d 1107, 1119 (2004).

¶ 65    Yasemin argues that, concerning her own income, the court failed to consider her testimony that she paid Medicare and social security taxes.

¶ 66    We have no reason to assume that the court misunderstood the testimony before it. When it indicated in its dissolution judgment that Yasemin earned $3444 net monthly, it copied the precise language that Yasemin's employer used in its letter stating she earned $3444 "net monthly." It is clear that the court found this to be more credible than Yasemin's testimony that this was a gross amount, especially because Yasemin contradicted that statement in other parts of her testimony.

¶ 67    Concerning taxes, the court specifically asked, "Will the Turkish government reimburse any U.S. taxes you have to pay?" Yasemin replied, "Partially, yes. Partially not because I'm a U.S. citizen." The following exchange then occurred:

> "THE COURT: I want to make sure I understand that. So Turkey will reimburse her for state and federal—
>
> MR. MARKEY [Onur's attorney]: For federal and state taxes—
>
> THE COURT: But not Social Security [because] she [is] a U.S. citizen?
>
> MR. MARKEY: Correct.

*** 

[YASEMIN]: Medicare is not reimbursed either.

THE COURT: Nobody asked about that, but thank you for volunteering."

¶ 68    In light of the above colloquy, the court understood Yasemin's tax status as an employee of the Turkish consulate. We therefore understand the court's order finding that Yasemin's income was "not taxable or deductible" as a reference to her employer's commitment to reimburse her for state and federal taxes. We do not agree that the court failed to understand that she paid her own social security and Medicare.

¶ 69    Yasemin also argues the trial court improperly calculated Onur's income. She contends that it relied on his December 2021 paystub while ignoring Onur's bonuses in other years and the $2.28 per hour raise that his 2022 paystubs indicate.

¶ 70    In support of her argument, she cites *In re Marriage of Pratt*, 2014 IL App (1st) 130465, where we affirmed the trial court's decision to calculate a divorcing father's income, in the context of determining child support, using his most recent year's net total. *Id.* ¶ 24. The divorcing father had argued that his income for that year included "disputed items which significantly increased" the final number, and the previous year was therefore more representative. (Internal quotation marks omitted.) *Id.* We held that the trial court did not abuse its discretion when it focused on the income at the time the child support calculations were made and noted our supreme court has held that the relevant focus should be at that time. *Id.*

¶ 71    But *Pratt* only confirms our deference to the trial court's determination of how best to determine the parties' respective incomes. We emphasized repeatedly throughout that opinion that these calculations and the child support awards based on them are within the trial court's discretion. *Id.* ¶¶ 22, 25, 28, 32, 33.

¶ 72     Here, the figure that the court used matched Onur's final paystub for 2021. This was the last full year for which the court had a record of his reported income. In that year he did not receive a bonus, although he had in other years. It was not unreasonable to use that amount. We have made clear that "[w]e will not find an abuse of discretion simply because an alternative [method of determining income] may have been available to the trial court." *Vance v. Joyner*, 2019 IL App (4th) 190136, ¶ 75.

¶ 73            D. Contribution to Attorney Fees and Reallocation of GAL Fees

¶ 74     Yasemin argues the court's ruling that each party should pay its own outstanding attorney fees, and its reallocation of GAL fees 60% to Onur and 40% to her, was an abuse of discretion.

¶ 75     Section 508 of the Act provides that "[t]he court from time to time, after due notice and hearing, and after considering the financial resources of the parties, may order any party to pay a reasonable amount for his own or the other party's costs and attorney's fees." 750 ILCS 5/508(a) (West 2022). "Attorney's fees in a dissolution of marriage proceeding are the primary obligation of the party for whom the services are rendered." *In re Marriage of Sanbor*, 78 Ill. App. 3d 146, 152 (1979). "The allowance of attorney's fees to the opposing party is justified, however, where the party seeking relief demonstrates financial inability to pay and the ability of the other spouse to do so." *Id.* We apply an abuse of discretion standard to a trial court's decision regarding contribution for attorney fees. *In re Marriage of Haas*, 215 Ill. App. 3d 959, 965 (1991).

¶ 76     In support of her argument, Yasemin cites the court's previous agreed order in which it found Onur had the ability to pay for fees and Yasemin did not, the difference between Onur's and Yasemin's awarded bank accounts, and the difference between the amount Onur paid his attorney ($43,271.62) and the amount Yasemin states that her attorneys were paid ($11,000). She cites *In re Marriage of Pond and Pomrenke*, 379 Ill. App. 3d 982, 993 (2008), where we held that the trial court abused its discretion by failing to award a contribution for attorney fees and where the

husband's income was over twice that of his former wife's. *Id.*

¶ 77    The parties' disparate incomes, however, was not the only factor leading to our reversal in *Pond*. We also noted that the wife's award "consist[e]d largely of retirement accounts and illiquid assets" that would have required liquidation to pay the fees. *Id.* In addition, the husband had no outstanding child support or maintenance obligations. *Id.*

¶ 78    Onur, unlike the husband in *Pond*, was required to pay both maintenance and child support. The trial court also ordered Onur to pay Yasemin a substantial liquid sum for her portion of the marital residence. In addition, Yasemin testified that she also sold a property in Turkey during the pendency of the case for over $20,000, which she stated she did not use on attorney fees but on "her needs" and for her father's debts.

¶ 79    The trial court had before it substantial evidence regarding the parties' respective incomes, expenses, and debts. It is apparent from the trial court's detailed judgment that it factored all of that in deciding not to order Onur to pay more of Yasemin's attorney fees. We do not find its determination to be an abuse of discretion.

¶ 80    As to GAL fees, section 506 of the Act states that "[t]he court shall enter an order as appropriate for costs, fees, and disbursements, including a retainer, when the attorney, guardian ad litem, or child's representative is appointed." 750 ILCS 5/506(b) (West 2022). "Any order approving the fees shall require payment by either or both parents, by any other party or source, or from the marital estate or the child's separate estate." *Id.* We apply an abuse of discretion standard to review a court's award of GAL fees. *In re Marriage of Soraparu*, 147 Ill. App. 3d 857, 864 (1986).

¶ 81    Here, the circuit court initially ordered Onur to pay all the appointed GAL's fees. Upon appointing a new GAL, the court required Yasemin to pay $750 and Onur to pay $1750. When the

court issued its order dissolving the marriage, it reallocated any outstanding fees according to a 60-40 split with Onur paying 60% and Yasemin paying 40%.

¶ 82    Yasemin supports her argument that the trial court abused its discretion using the same factual arguments she made to contest the trial court's denial of contribution for attorney fees. For the same reasons that we find no abuse of discretion in the failure to order Onur to pay more of Yasemin's attorney fees, we find no abuse of discretion in reference to the GAL fees. The trial court took careful account of the parties' respective incomes, debts, and ongoing responsibilities. We cannot say that its decision on this allocation was an abuse of discretion.

¶ 83                                              IV. CONCLUSION

¶ 84     For the foregoing reasons, we affirm the trial court's order.

¶ 85    Affirmed.