2026 IL App (1st) 242393-U

SECOND DIVISION
June 23, 2026

No. 1-24-2393

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| *In re* THE MARRIAGE OF: | ) | Appeal from the |
| | ) | Circuit Court of |
| BRYAN DOW, | ) | Cook County |
| | ) | |
| Petitioner-Appellant, | ) | 2022 D 430325 |
| | ) | |
| and | ) | Honorable |
| | ) | William Stewart Boyd, |
| KARI DOW, | ) | Bradley R. Trowbridge, |
| | ) | Judges Presiding |
| Respondent-Appellee. | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Van Tine and Justice McBride concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed. Court did not err in denying petition to return minor child to Illinois or in allowing child to remain in Florida. Court did not err in award of child support.

¶ 2    In 2022, Bryan and Kari Dow separated after four years of marriage. Kari permanently moved to Florida with the couple's only child. Bryan claims he never agreed to the move and, shortly after filing for divorce in Illinois, sought to force Kari to return the child to this state. After a lengthy hearing, the trial court denied that request.

¶ 3    The case then continued as a fairly routine marital-dissolution case, culminating in a trial. The court entered an Allocation Judgment that allowed Kari and the minor child to remain in

Florida. The court's dissolution judgment also required Bryan to pay child support. In determining the amount of support, the court declined to consider substantial sums of money Kari was receiving from her father every month, as the court was persuaded by Kari's unrebutted testimony that the money was a loan she was required to repay.

¶ 4     On appeal, Bryan challenges both the order allowing the child to remain in Florida and the court's child-support calculation. We find no error and affirm.

¶ 5                                          BACKGROUND

¶ 6     Bryan and Kari were married in February 2018. Kari gave birth to their son in January 2019. Throughout the marriage, Bryan worked as a union pipefitter; Kari did not work. Until 2022, they owned a home and lived in Illinois.

¶ 7     In early 2022, the couple was experiencing marital problems. They sold their home in May 2022. They put most of their possessions in storage and, for a short time, stayed either with friends or in a hotel. They discussed a move to Florida, though they disagreed at trial on how concrete that plan was; Kari said it was firm, while Bryan said it was preliminary.

¶ 8     Either way, not long after selling their house, Bryan drove Kari and their son to Kari's father's condo in Florida. Bryan then drove back to Illinois, rented a truck, loaded much of the contents of the storage unit into his truck, and drove them down to Florida. He later helped ship other items, including furniture and Kari's car, to Florida.

¶ 9     As noted, Bryan testified that he didn't consider the move to Florida permanent. He thought their plan was to buy a new house somewhere and work on their marriage. Florida was one option, he said, but not the only one. He returned to Illinois only so he could find work while Kari and their son stayed in Florida for the summer.

¶ 10    Kari unequivocally testified that, though he discussed other places, Bryan agreed to move to Florida. The plan was to move down there and allow the couple to work on their marriage.

¶ 11    In late May and June, with Bryan in Illinois and Kari and their child in Florida, the parties exchanged text messages that illustrate the rocky and tense nature of their marriage. For example, on May 28, Bryan wrote, "if you want it to end OK I accept it," "I'm starting the separation process," and "I borderline don't want anything from you anymore other than to take care of my son," while also stating such sentiments as "I love you[,] you just keep pushing me away." On June 1, Kari wrote: "I'm stupid for even thinking I could communicate with you." And this from Bryan: "I'm done with your silence, I'm assuming our marriage is over" and "[e]ventually we're going to need to bring the courts into this and establish legal boundaries."

¶ 12    On June 4, Bryan texted Kari a photo of a firearm, telling her that "[t]hey're about to enforce [the Covid-19] lockdown again" and "[b]e vigilant my wife." Kari twice asked Bryan if that gun was his, but he did not respond. Bryan testified that it was his father's gun and he was not threatening Kari: "that was a Marine husband telling his wife" "to be safe."

¶ 13    On July 22, Kari obtained the Florida equivalent of an emergency order of protection against Bryan. She alleged that Bryan was physically abusive to her and their son and mentally abusive to her. The order of protection prohibited Bryan from all contact with both Kari and their child. Bryan was aware of the order of protection no later than September, when it was served by the police. There was evidence that he had actual notice of the order in July. (The order of protection became permanent and was still in effect at the time of trial.)

¶ 14    In August 2022, Bryan filed a petition for dissolution of marriage in Illinois.

¶ 15    On October 31, 2022, Bryan filed an emergency motion to return the minor child to Illinois. In that petition, Bryan alleged that Kari's move to Florida with their child violated

section 609.2 of the Illinois Marriage and Dissolution of Marriage Act (the "MDMA"), 750 ILCS 5/609.2 (West 2022), which governs a parent's relocation involving minor children. At the hearing, Bryan stated that Kari had "kidnapped" or "stolen" their son, and that Kari did not follow the procedure outlined in section 609.2, rendering the relocation "illegal."

¶ 16    Judge Boyd held a three-day evidentiary hearing. The testimony primarily focused on the events leading to the move to Florida and whether Bryan agreed to the relocation. On August 18, 2023, the court entered a written memorandum order denying Bryan's motion.

¶ 17    The court gave two reasons. First, section 609.2 was inapplicable, as a dissolution of marriage proceeding had not yet been filed in May 2022, so the MDMA did not apply when Kari moved with her son to Florida. And second, the court found that Bryan was aware of and consented to the move, regardless of technical compliance with section 609.2. The court found Bryan's testimony to the contrary "evasive" and "not credible."

¶ 18    The case was reassigned to Judge Trowbridge, who presided over the trial in summer 2024. On the topic of the child's relocation, the court advised the parties that it read Judge Boyd's order and the record and would not relitigate the three days of testimony leading to that order. Instead, he would judicially notice Judge Boyd's order and hear any evidence or allegations on the topic of returning the child to Illinois that post-dated Judge Boyd's order.

¶ 19    The trial focused almost exclusively on the parties' finances. As Bryan's arguments on this topic are limited, we can be brief. Suffice it to say that, at the time of trial, Bryan was on disability and unemployment benefits due to a motorcycle accident. He could not lift more than 40 pounds. His current goal was rehabilitation and returning to work as a pipefitter.

¶ 20    While Kari was now employed, she only received sales commissions. In the year before trial, she had only earned about $500 in commissions. Most of her funding came from her father,

who provided her about $6,000 a month and was also paying her legal bills. According to Kari, "[e]verything that's being given to me including your legal bills are [my] responsibility to repay when I can and am able to."

¶ 21     On August 2, 2024, the court entered the Allocation Judgment after trial. That judgment provided, in relevant part, that:

> "The minor child shall reside with KARI, which may be in the state of Florida where they presently reside. On August 18, 2023, the Honorable Judge Boyd ruled in this matter that KARI shall be entitled to reside in Florida. KARI is granted leave to continue to reside in Florida with the minor child."

Given the order of protection in Florida, the court "reserved" Bryan's visitation with their son but noted that it would reconsider the issue if the Florida order were modified or terminated.

¶ 22     A separate Dissolution Judgment, also entered on August 2, ordered Bryan to pay maintenance and child support. The court based its figures on the Illinois child support worksheet, which it attached to its order. The order required Bryan to pay $833 a month in child support while under the obligation to pay maintenance and $1,246 "[o]nce maintenance terminates." In reaching these figures, the court found that Bryan's gross income was "9,165" per month, while Kari's was "42" a month.

¶ 23     Bryan moved to reconsider both orders. On November 15, 2024, the court slightly modified its orders. First, the court recognized that it erred in awarding Kari maintenance, "as the parties had stipulated that each would waive maintenance." The court then found that it was required to set child support at $1,300—instead of $1246—in light of its vacatur of maintenance. In reaching this number, the court revisited its income calculations. Instead of the original income amounts, the court determined that Bryan's income was "$9917 monthly" while Kari's

was "$25 monthly." The court specifically found "that [Kari's] monthly payments from her father are not income for child support purposes, as [she] testified that the sums were loans from her father, and that there was no evidence presented at trial to the contrary."

¶ 24    Bryan timely filed his notice of appeal, which listed, among many others, Judge Boyd's order, the Allocation Judgment, and the Dissolution Judgment.

¶ 25    Despite being a case relating to the care and custody of a minor, Bryan's notice of appeal did not indicate that this was an expedited case per Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). When Kari informed this court that Bryan failed to follow the protocol for an expedited case, Bryan indicated that he was *not* seeking expedited consideration of this appeal, despite our rules requiring him to do so. As such, this case was never docketed as an expedited appeal.

¶ 26                                  ANALYSIS

¶ 27    On appeal, Bryan claims two errors in the court's judgment. First, the court erred on the relocation issue, as it failed to follow the procedures outlined in section 609.2 of the MDMA. Second, it was error to consider the $6,000 a month Kari receives from her father as a loan, not income, in calculating child support.

¶ 28    Preliminarily, Kari takes issue with the argumentative nature of Bryan's statement of facts. Her point is well taken. Bryan's statement of facts contains several unsupported or argumentative assertions. For example, he refers to Kari's "perjury" in securing her order of protection without any basis for saying so. He suggests that she initially moved to Florida, "unbeknownst to Bryan," under the "guise" of a short visit. That claim is not only one-sided and unsupported but contrary to what the court found—that the parties intended to relocate to Florida, and that Bryan's testimony to the contrary was not credible.

¶ 29    Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020) requires that the appellant's

brief contain facts free of argument and with citation to the record. We would be within our rights to strike the statement of facts or even the brief in its entirety. *Wilson v. University of Chicago Medical Center*, 2023 IL App (1st) 230078, ¶ 17. Instead, we will merely "disregard arguments and unsupported statements" in his statement of facts. *Id.*

¶ 30                                        I. Relocation

¶ 31    Before addressing the merits of the relocation issue, Kari argues that Bryan has forfeited his challenge because he raises no specific criticism of the Allocation Judgment itself. Rather, he focuses on Judge Boyd's original order from a year earlier, which is now moot. It is a valid point in one sense; the question at trial was whether the child should *now* be returned to Illinois so Bryan could have visitation rights, not whether the original relocation was valid.

¶ 32    On the other hand, as noted above, Judge Trowbridge told the parties before trial that he did not want to re-litigate Judge Boyd's order blow by blow, but he would hear any new evidence or argument that post-dated that order and was relevant to the question of relocating the child. And in his final judgment, he all but adopted Judge Boyd's order.

¶ 33    So while we agree that it might not be the most effective argument to relitigate a year-old ruling instead of focusing on what is best for the child now—"now" being the summer of 2024, the time of trial—the fact remains that an attack on Judge Boyd's ruling is, in one sense, an indirect attack on the Allocation Judgment that adopted that ruling. If that is how Bryan chooses to mount his challenge, we will hear him out.

¶ 34    That said, for the same reasons Judge Boyd gave, we find no merit to Bryan's challenge. His only complaint is that neither Kari nor Judge Boyd followed the procedures outlined in section 609.2 to adjudicate relocations of parents with minor children. See 750 ILCS 5/609.2

(West 2022). Specifically, he says Kari failed to give written notice or file a petition seeking relocation, and the court failed to make findings on the various factors governing relocation.

¶ 35   But Judge Boyd was correct that section 609.2 was not applicable when Kari moved with her son to Florida. The parties had not initiated dissolution proceedings yet. Section 609.2 does not apply every time a spouse moves a child out of state. It only applies to "[a] parent who has been allocated a majority of parenting time or *** equal parenting time." *Id*. § 609.2(b). Nothing of the kind had yet occurred when Kari moved with the child to Florida. There was no allocation judgment or parenting time; the parties were still married and had not yet filed for dissolution.

¶ 36   Indeed, even after dissolution proceedings have begun, we have found section 609.2 inapplicable without an allocation of parenting time. See *Tyler A. Z. v. Lauren A. R.*, 2021 IL App (3d) 210360-U, ¶ 23; *In re Marriage of Whitney H. and Daniel B.*, 2021 IL App (4th) 210357-U, ¶¶ 39, 42. Needless to say, section 609.2 does not apply before a spouse even files for divorce. The court correctly found section 609.2 inapplicable.

¶ 37   Bryan warns that our ruling will incentivize parents to quickly whisk their children away from the state before a dissolution action is filed. But custody and parenting time are central issues in any marital-dissolution action involving minor children, and nothing prevents a parent from litigating these questions once the dissolution action is filed. Nor do the criminal laws against child abduction and kidnapping cease to exist, where appropriate. In any event, we are required to enforce the statute as written; we cannot force its application onto a set of facts to which it clearly does not apply. We uphold the court's finding.

¶ 38                                   II. Child Support

¶ 39   Next, Bryan claims the court erred in refusing to consider the $6,000 a month Kari received from her father as "income" and in finding, instead, that the money is a loan to be

repaid. Notably, he does not argue that the trial court's finding was against the manifest weight of the evidence. Instead, he argues that "loans" are income, period, and thus the court committed legal error in ruling otherwise. That is incorrect.

¶ 40     The MDMA calculates child support based on a parent's monthly net income. 750 ILCS 5/505(a) (West 2022). Net income is gross income "minus enumerated standardized tax amounts and adjustments." *In re Marriage of Ash and Matschke*, 2021 IL App (1st) 200901, ¶ 34; see 750 ILCS 5/505(a)(3)(B) (West 2022). As Bryan notes, "gross income" is "the total income from all sources," less benefits not relevant here. *Id*. § 505(a)(3)(A). Our supreme court recognized that, under the MDMA, "income" is expansive and includes things that may not constitute "income" under the Internal Revenue Code. *In re Marriage of Rogers*, 213 Ill. 2d 129, 137 (2004).

¶ 41     When it comes to loans, the statute is silent. Our supreme court in *Rodgers* declined "to address whether and under what circumstances loan proceeds are properly regarded as an element of income for child support purposes" because, in that case, the "loans" were "loans in name only." *Id*. at 140. So Bryan's argument that *Rogers* held that "loans made to the payor were to be considered as income" is flat wrong, which may be why he cited to the decision generally and not to a specific page of the decision. *Rogers* held no such thing.

¶ 42     Indeed, since *Rodgers*, we have repeatedly recognized that whether loans count as income depends on the facts of a given case. For example, in *In re Marriage of Tegeler*, 365 Ill. App. 3d. 448, 458 (2006), we noted that "*in general*, loans should not be considered income." (Emphasis added.) In *Vance v. Joyner*, 2019 IL App (4th) 190136, ¶ 61, we agreed with *Tegeler* that generally loans are not income but recognized that "when a purported loan requires no repayment or returned obligation, the proceeds should be considered income and included as part of a parent's monthly net income." *Id*.

¶ 43 A textbook example of a loan that is *not* income is "a residential mortgage loan, made by a *bona fide* lender." *In re Marriage of Baumgartner*, 384 Ill. App. 3d 39, 52 (2008). On the other hand, familial " 'loans' without repayment," properly characterized as "gifts," are considered income. *In re Marriage of Anderson and Murphy*, 405 Ill. App. 3d 1129, 1137 (2010).

¶ 44 Obviously, then, whether money given to a spouse is a *bona fide* loan or a "loan in name only" (*Rogers*, 213 Ill. 2d at 140) requires the court to "examine the evidence and determine whether the payment's features fit within the plain meaning of income." *Vance*, 2019 IL App (4th) 190136, ¶ 61. The ultimate determination is one of law (*Ash and Matschke*, 2021 IL App (1st) 200901, ¶ 33), but the character and nature of the loan is undeniably a factual finding resolved by the trial court. In the context of child support, as always, we review the circuit court's "independent factual findings" to determine whether they are against the manifest weight of the evidence. *In re Marriage of Saracco*, 2014 IL App (3d) 130741, ¶ 16.

¶ 45 Here, Bryan does not attack, or even address, the court's specific factual finding that the payments from Kari's father were not income. The court credited Kari's testimony that she was expected to repay her father the money and noted that her testimony was unrebutted. As Bryan does not challenge that finding, relying instead on a black-letter legal argument (incorrect though it is), we are in no position to disturb the factual finding that the loans from Kari's were just that—*bona fide* loans and thus not income. We uphold this finding as well.

¶ 46 CONCLUSION

¶ 47 The judgment of the circuit court is affirmed.

¶ 48 Affirmed.